CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA

September 16, 2025

LAURA A. AUSTIN , CLERK
BY  KRISTIN AYERSMAN
    DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### HARRISONBURG DIVISION

| | | |
|---|---|---|
| MICHAEL J. SWARTZENDRUBER, for himself and on behalf of others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 5:22-cv-55 |
| v. | ) ) | |
| SENTARA RMH MEDICAL CENTER, RMH MEDICAL GROUP, LLC, UNITED HEALTHCARE INSURANCE COMPANY, UNITED HEALTHCARE OF THE MID-ATLANTIC, INC., | ) ) ) ) ) ) ) | By:    Michael F. Urbanski Senior United States District Judge |
| Defendants. | ) | |

## MEMORANDUM OPINION

The case is presently before the court on motions for summary judgment filed by defendants United Healthcare Insurance Company and United Healthcare of the Mid-Atlantic, Inc. (collectively "United"), and defendants Sentara RMH Medical Center and RMH Medical Group, LLC (collectively "Sentara"), and a motion to exclude expert testimony filed by plaintiff Michael Swartzendruber.

Plaintiff contends that he was improperly billed by his health care provider, Sentara, and improperly reimbursed by his health insurer, United, for blood tests done in 2019 and 2021. On each occasion, plaintiff's blood was drawn at a Sentara satellite outpatient location and tested at Sentara's main hospital location. Sentara billed, and United processed and reimbursed, charges for medical services based on rates associated with the main hospital

location as opposed to rates of certain providers operating at the satellites. Plaintiff claims Sentara and United violated federal law, namely the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1132, et seq. (ERISA), by overcharging him for hospital services and/or by making misrepresentations about the charges for his blood tests. Plaintiff brought three claims under ERISA: Count I: Violation of 29 U.S.C. § 1132(a)(1)(B) against United; Count II: Violation of 29 U.S.C. § 1132(a)(3) against all defendants; and Count III: Violation of 29 U.S.C. § 1132(a)(3) against all defendants.

As explained herein, plaintiff's evidence, considered in the light most favorable to him, does not establish that United abused its discretion or engaged in misrepresentations, or that Sentara is liable as an ERISA fiduciary. Accordingly, United's motion for summary judgment, ECF No. 129, is **GRANTED**, Sentara's motion for summary judgment, ECF No. 130, is **GRANTED**, and plaintiff's motion to exclude expert testimony, ECF No. 133, is **DENIED**.

## I.    <u>Background</u>

This case arises out of blood draws and tests plaintiff received in 2019 and 2021, for which plaintiff argues he was improperly billed. Plaintiff Michael Swartzendruber had two blood draws: one in September 2019 and one in June 2021. The September 2019 blood draw physically took place at 1790-64B East Market Street, Harrisonburg, VA 22801. Defs.' Joint Statement of Undisputed Material Facts in Supp. of Defs.' Motion for Summ. J., ECF No. 169, ¶57 (hereinafter "DSOF"). This facility is called the East Market Health Center ("EMHC"). <u>Id.</u> The June 2021 blood draw physically took place at 1661 South Main Street, Harrisonburg, VA 22801. <u>Id.</u> ¶58. This facility is called the South Main Health Center ("SMHC"). Despite both blood draws physically taking place at these locations, the blood

samples were sent out to a separate location, "Sentara RMH Medical Center's main hospital location," for testing. Id. ¶¶94, 110 This separate location—the main hospital location—is located at 2010 Health Campus Drive, Harrisonburg, VA, 22801. Id. ¶98. When plaintiff ultimately received his bills for these blood draws, the billing entity listed the provider as the main hospital location, despite the blood draws ("venipuncture") physically occurring elsewhere. See id. ¶¶98-99, 114-115.

Plaintiff's claim that Sentara should have charged and United should have processed and reimbursed his claim based on United's contract applicable to the location where his blood was drawn, as opposed to where it was tested, requires some discussion of Sentara's convoluted corporate and operational structure and Sentara's contracts with United. This background section outlines the corporate structure and contracts followed by an overview of the procedural history of this case.

A.    The Sentara Corporate Entities

At issue in this case are two Sentara entities: Sentara RMH Medical Center and Sentara RMH Medical Group. Sentara RMH Medical Center is a d/b/a name for Rockingham Memorial Hospital, which Rockingham Memorial Hospital formally changed its name to in 2013. DSOF ¶29; ECF No. 36-2 at 2. According to defendants, Sentara RMH Medical Center provides "facility services, including outpatient services," and is a legal entity and not a physical location. See id. ¶¶30, 33, 59. Though defendants argue Sentara RMH Medical Center is a legal entity and not a physical location, there is also a physical location with the same name that is located at 2010 Health Campus Drive, Harrisonburg, VA. Id. ¶33. Sentara RMH Medical

Group is a d/b/a name for RMH Medical Group, LLC. Id. ¶38. Sentara RMH Medical Group provides professional services, and is a legal entity and not a physical location. Id. ¶¶41, 59.

Both Sentara RMH Medical Group and Sentara RMH Medical Center provide services at EMHC and SMHC. DSOF ¶56. EMHC and SMHC are "accredited off-campus departments of Sentara RMH Medical Center." Id. ¶27.

### B.    The Leases

Sentara RMH Medical Center has leases at both EMHC and SMHC. See Defs. Ex. RR, SS. Sentara RMH Medical Group has a lease at SMHC. See Defs. Ex. TT. Though Sentara RMH Medical Group only has a lease at SMHC, Sentara RMH Medical Group physicians can perform services at EMHC. See DSOF ¶¶44-45.

At the relevant time, Sentara RMH Medical Center's lease at EMHC was for the "[p]ermitted uses … [of] 'an urgent care center, laboratories, offices, or any other medical or office use offered by Tenant." DSOF ¶57. The "Tenant" for the purposes of the EMHC lease was Rockingham Memorial Hospital. Defs. Ex. RR at SENTARA00567. At SMHC, both Sentara Rockingham Memorial Hospital and Sentara RMH Medical Group maintained leases. See Defs. Ex. BBB at 11-13 (noting "[t]here are three leases" at SMHC, "South Main Family Medicine (trading as Sentara RMH Medical Group); Sleep Center (trading as Sentara RMH Medical Group); and Imaging Laboratory (trading as Sentara RMH Medical Center)."). Sentara Rockingham Memorial Hospital's lease at SMHC included permitted uses of "[m]edical offices for the conduct of Tenant's laboratory and medical imaging services and ancillary uses." Defs. Ex. SS at SENTARA00539. "Tenant" was defined as Sentara Rockingham Memorial Hospital for the purposes of that lease. Id. Sentara RMH Medical Group's lease at SMHC included

4

permitted uses of "[a] medical office for the conduct of Tenant's practice of family medicine and related services." Defs. Ex. TT at SENTARA00616. The "Tenant" for the purposes of Sentara RMH Medical Group's lease at SMHC was defined as "Sentara RMH Medical Group, t/a South Main Family Practice." Id.

### C.    The Contracts

Sentara and United have two contracts at issue, one for hospital services, the Facility Purchase Agreement ("FPA"), and one for medical group services, the Medical Group Participation Agreement ("MGPA"). Plaintiff asserts that because his blood was drawn at satellite locations—EMHC and SMHC—and not the main hospital location, and was ordered by a provider associated with the MGPA, the lower rates in the MGPA apply to his blood draw charges, as opposed to the FPA.

The Facility Purchase Agreement is an agreement "by and between United HealthCare Insurance Company, contracting on behalf of itself, UnitedHealthcare of the Mid-Atlantic, Inc. and the other entities that are United's Affiliates (collectively referred to as "United")" and a host of Sentara Hospitals as listed in Appendix I ("Facility"). Pl. Ex. B.[1] Rockingham Memorial Hospital was added to the FPA via amendment in 2011. Defs. Ex. DD. Following the amendment, Rockingham Memorial Hospital formally changed its name to Sentara RMH Medical Center in 2013. See ECF No. 36-2 at 2. The FPA relates to services provided by facilities listed in an appendix to the FPA. See Pl. Ex. B at § 3.1. Claims submitted under the FPA must be submitted "using current UB-04 forms or successor forms for paper claims and

---

[1] Plaintiff filed exhibits both to his Daubert motion, ECF No. 133, and his Statement of Facts in Dispute Precluding Summary Judgment, ECF No. 161, using the same alphabetical naming convention, but applying the letters to different exhibits. Unless otherwise stated, the citation convention "Pl. Ex. __" refers to an exhibit to plaintiff's Daubert motion. See ECF No. 160.

HIPAA standard professional or institutional claim formats for electronic claims as applicable, with applicable coding including, but not limited to, ICD-9-CM, CPT, Revenue and HCPCS coding." Id. § 3.1.

The Medical Group Participation Agreement is an agreement "by and between UnitedHealthcare Insurance Company, contracting on behalf of itself, UnitedHealthcare of the Mid-Atlantic, Inc., and the other entities that are United's Affiliates (collectively referred to as "United"), and Sentara Medical Group ("Medical Group")." Pl. Ex. D. The MGPA relates to services provided by "Medical Group Physician[s]" who practice "as a shareholder, partner, or employee of Medical Group, or who practice[] as a subcontractor of Medical Group" and "Medical Group Non-physician Provider[s]" who "render[] Covered Services as an employee or subcontractor of Medical Group." Id. §§ 1.5, 1.6, 3.1. The MGPA applies to "Medical Group's practice locations" set forth in an appendix to the MGPA. Id. § 3.1. Claims under the MGPA must be submitted "using current CMS 1500 form or its successor for paper claims and HIPAA standard professional or institutional claim formats for electronic claims, as applicable, with applicable coding including, but not limited to, ICD, CPT, Revenue and HCPCS coding." Id. § 7.1. The MGPA notes that "Medical Group will submit claims only for services performed by Medical Group or Medical Group staff. Pass through billing is not payable under this Agreement." Id.

In addition to the FPA and MGPA, also relevant are plaintiff's health insurance plans associated with his former employer, Rosetta Stone, Ltd. See ECF No. 18-1 (hereinafter "2019 Plan"); ECF No. 18-2 (hereinafter "2021 Plan"). The Sentara entities are not parties to plaintiff's health insurance plans. See id. The Plan Sponsor, Named Fiduciary and Plan

Administrator of plaintiff's health insurance plans is Rosetta Stone, Ltd. See 2019 Plan at Pageid# 260; 2021 Plan at Pageid# 453. The Claims Fiduciary of plaintiff's health insurance plans is UnitedHealthcare Insurance Company. Id. ("UnitedHealthcare Insurance Company ("UnitedHealthcare," refer to your Certificate of Coverage for details on the legal entity that provides your coverage) is your Plan's Claims Fiduciary and has been assigned this responsibility by your Plan Sponsor."). Benefits under the plans were provided to plaintiff under a group insurance contract entered into between Rosetta Stone and UnitedHealthcare. Id. Claims for benefits under the plans were to be sent to UnitedHealthcare. Id. Rosetta Stone and UnitedHealthcare "share[d] responsibility for administering the plan[s]." Id.

    **D.**    **The Alleged Misrepresentations**

Plaintiff alleges that the Sentara defendants improperly billed him, and his insurance company, for certain services rendered. These services, a September 2019 venipuncture and a June 2021 venipuncture, were rendered by employees of different Sentara entities. The September 2019 venipuncture service was rendered by a Sentara RMH Medical Center employee at EMHC. DSOF ¶¶91-93. The June 2021 venipuncture service was rendered by a Sentara RMH Medical Group employee at SMHC. Id. ¶¶107–109. Both blood samples were sent out to Sentara RMH Medical Center's main hospital location located at 2010 Health Campus Drive after the blood was drawn from plaintiff. Id. ¶¶94, 110. When plaintiff was billed for the venipunctures that were physically conducted at EMHC and SMHC, he was billed under the FPA between United and Sentara RMH Medical Center, rather than the MGPA between United and Sentara RMH Medical Group. See id. ¶¶97-99, 113-115;

Corrected Second Amended Class Action Complaint, ECF No. 112, ¶¶57, 87 (hereinafter "the

Complaint" or "Compl.").

Plaintiff alleges a number of misrepresentations arising out of this billing issue: first,

that Sentara lied to United when it sent United claims for services rendered at 2010 Health

Campus when the venipunctures physically took place elsewhere; second, that United lied on

its website when plaintiff sought estimates for the blood tests; and third, that United lied on

the phone when plaintiff called United to ask how much the service(s) would cost at SMHC.

See generally Compl.

As to the first alleged misrepresentation, the Sentara defendants argue that they

properly billed the services as originating from Sentara RMH Medical Center as both EMHC

and SMHC are off-campus departments of Sentara RMH Medical Center, and even putting

that aside, the MGPA covers services rendered by Physicians and Non-Physicians in the

Medical Group, rather than services rendered at specific locations. Sentara MSJ at 18-19;

DSOF ¶64. Plaintiff disputes that Sentara appropriately billed the services, arguing that

defendants' statements to the contrary in their Joint Statement of Facts are improper legal

conclusions. See Pl. Stmt. Facts in Dispute, ECF No. 161, at DSOF 64 (hereinafter

"PODSOF"). The Sentara defendants do not explain in-depth in their briefing why the June

2021 venipuncture, which was rendered by a Sentara RMH Medical Group employee,

constituted a service performed by Sentara RMH Medical Center. See, e.g., Sentara MSJ at 9

n.4.

The second alleged misrepresentation arises out of plaintiff's use of United's website

to estimate the costs of blood test services. In August or September 2019, plaintiff used

8

United's online cost estimator tool to obtain estimates for services. DSOF ¶76 (stating plaintiff used the estimator tool in September 2019); id. ¶79; PODSOF at 11 (not disputing DSOF ¶79); id. at DSOF 76 (not disputing date); but see Swartzendruber Decl., ECF No. 143 ¶9 (stating plaintiff checked the website estimator tool on August 7, 2019). These prices were significantly lower than the prices ultimately billed to plaintiff. Defendants state that plaintiff "obtained estimates for services from the physician practice at East Market Health Center, not the lab draw site operated by Sentara RMH Medical Center at East Market Health Center." DSOF ¶76. In June 2021, plaintiff again used the cost estimator tool on United's website. Id. ¶83. The prices estimated were similarly lower than the prices billed to plaintiff. Defendants state that plaintiff "obtained estimates for services to be performed by the physician practice at South Main Health Center, not the lab draw site operated by Se[n]tara RMH Medical Center at South Main Health Center." Id. Plaintiff disputes defendants' characterization of which estimates plaintiff found via the cost estimator tool. See PODSOF at DSOF 76, 83. Plaintiff states that "[h]e obtained the only estimates that could be obtained for a blood draw at the East Market Street Health Center" and at the SMHC. Id. Plaintiff alleges that United improperly programmed the cost estimator tool to use the MGPA rates, even though neither EMHC nor SMHC "had the proper license to perform such tests" and thus "the blood tests never could have been billed through the [MGPA]." Compl. ¶¶133, 135; see also id. ¶137 (indicating the blood draws could be billed under the MGPA, but the blood tests could not).

The third alleged misrepresentation arises out of plaintiff's phone call with a United representative in 2021. Plaintiff called United to obtain estimates for the June 2021 blood work. DSOF ¶87; see also Defs. Ex. MM. "Plaintiff struggled to determine the right Sentara

entity for which he was requesting cost estimates, [so] he offered to Google the address and advise the United customer service representative of the results, noting that the provider was a family practice 'in [his] doctor's office.'" DSOF ¶87; see also Defs. Ex. MM at 3:22-4:4 (United representative responding "[t]here's 108" when asked by Swartzendruber how many entities come up under the name of Sentara RMH). The United representative then identified RMH Medical Group as the provider at SMHC and asked plaintiff to confirm that the family practice would do the labs. DSOF ¶87. Plaintiff so confirmed. Id.; see also Defs. Ex. MM at 5:10-6:6. The United representative then provided plaintiff estimates using the fee schedule for the "family practice RMH Medical Group operated at the South Main Health Center address." DSOF ¶88. However, plaintiff was ultimately served by the lab draw site operated by Sentara RMH Medical Center at SMHC at the same address. Id. Defendants state that plaintiff "never asked which Sentara entity would be providing the services he received on September 10, 2019 and June 21, 2021." Id. ¶89; PODSOF at 11 (not disputing DSOF 89 as to accuracy). Plaintiff disputes that United had in its system a fee schedule for a lab draw site operated by Sentara RMH Medical Center. PODSOF at DSOF 88.

### E.    Procedural History

This matter comes before the court following the court's earlier motion to dismiss ruling in 2023. In that ruling, the court dismissed RICO and Virginia Consumer Protection Act claims by the plaintiff. See Mem. Op., ECF No. 47 (hereinafter "MTD Opinion"). Following that ruling, defendants answered plaintiff's complaint. After a hearing, the court stayed class discovery and set a 60-day discovery period limited to the merits of plaintiff's individual claims. See ECF No. 83. Shortly before that 60-day period expired, plaintiff moved

for leave to file a second amended complaint. See ECF No. 106. The court granted plaintiff's

motion for leave to so file. See ECF No. 110.

In plaintiff's Corrected Second Amended Complaint, plaintiff puts forth three claims:

Count I: Violation of 29 U.S.C. § 1132(a)(1)(B) against United; Count II: Violation of 29 U.S.C.

§ 1132(a)(3) against all defendants; and Count III: Violation of 29 U.S.C. § 1132(a)(3) against

all defendants. Count I is a class claim, that argues each member of the class was entitled to

the benefits of their health insurance plan, which included that medical services done at an

outpatient center as ordered by a provider associated with the MGPA would be billed pursuant

to the negotiated rate applicable to the MGPA. Compl. ¶121. Count I is limited "to services

that were performed at outpatient centers, like the Plaintiff's blood draw, and does not include

services, like the blood tests, that were performed at a facility listed under" the FPA. Id. ¶130.

Count II is an individual claim that alleges that plaintiff was misled by United about the

benefits of his plan due to United's programming of its cost estimator tool and United's

training of its customer service representatives to provide fee schedules associated with the

MGPA, when in fact specific services could only be performed under the FPA. Id. ¶¶132–

137. Count II alleges that the Sentara and United defendants were put on notice that United

had misprogrammed its website and mistrained its agents, but took no steps to fix the issue(s).

Id. ¶¶148–149. Count III is a class claim that alleges that the Sentara defendants should be

required to resubmit the claims correctly to United, and United should then reprocess the

claims, and provide an explanation to each member of the class "about the actual amount

allowed for each treatment and the effect on the plan benefits by giving a new explanation."

Id. ¶¶153–161.

11

Defendants answered the complaint. See ECF Nos. 118, 119. Following their answers, the parties continued the limited discovery period the court had previously ordered. Defendants then filed motions for summary judgment on January 31, 2025. See United Defs. Mtn. Summ. J., ECF No. 129; Sentara Defs. Mtn. Summ. J., ECF No. 130; United Defs. Mem. Supp. Summ. J., ECF No. 164 (hereinafter "United MSJ"); Sentara Defs. Mem. Supp. Summ. J., ECF No. 167 (hereinafter "Sentara MSJ"). In their respective motions, defendants moved the court to enter summary judgment on all applicable claims (all claims as to United; Counts II and III as to Sentara). See id. Alongside their motions, defendants filed a joint statement of facts. See DSOF.

Plaintiff filed a motion to exclude expert testimony of defendants' expert the same day defendants filed their motions for summary judgment. See Pl. Mtn. Exclude, ECF No. 133 (hereinafter "Pl. Daubert Mtn."). Plaintiff did not file a motion for summary judgment.

Plaintiff then opposed defendants' motions for summary judgment, and filed his own statement of facts. See Pl. Opp. United, ECF No. 162; Pl. Opp. Sentara, ECF No. 163; PODSOF. In his statement of facts in dispute, plaintiff provided both a separate statement of facts and a response to defendants' statement of facts. See id.

Defendants jointly opposed plaintiff's Daubert motion. See Defs. Daubert Opp., ECF No. 141. Defendants then replied in support of their own summary judgment motions and responded to plaintiff's PODSOF. See United Reply MSJ, ECF No. 165; Sentara Reply MSJ, ECF No. 168; Defs. Reply DSOF, ECF No. 166. In their reply to plaintiff's statement of facts, defendants point out that plaintiff did not file a summary judgment motion, and thus is only

entitled to respond to defendants' statement of facts, and not provide his own. See Def. Reply DSOF.

Plaintiff replied in support of his Daubert motion. See Pl. Daubert Reply, ECF No. 146.

The court heard argument on these motions on April 23, 2025. See ECF Nos. 154, 158. Following the hearing, plaintiff's counsel filed a notice advising the court of a correction to an answer counsel provided the court at the hearing. ECF No. 155. Plaintiff's counsel clarified in his notice that Count III, like Count I, relates only to the blood draw charges, and not the blood test charges. See id. Count II relates to both the blood draws and blood tests. Id.; see also Compl. ¶¶ 131-152.

## II.    Discussion

The court addresses its jurisdiction, then reviews plaintiff's Daubert motion, followed by defendants' respective motions for summary judgment.

### A.    Jurisdiction and Venue

The court has jurisdiction in this case pursuant to 29 U.S.C. § 1132(e) of the Employee Retirement Income Security Act of 1974, and 28 U.S.C. § 1331. Defendants do not contest that venue is proper in this court. See ECF No. 118 ¶24; ECF No. 119 ¶24.

### B.    Plaintiff's Daubert Motion

In order to address defendants' motions for summary judgment, the court must first rule on plaintiff's motion to exclude the expert testimony of defendants' expert, Kristina Kahan, ECF No. 133. Having reviewed the parties' briefing and the Kahan Report, the court **DENIES** plaintiff's motion to exclude, for the reasons discussed below.

### 1.    Legal Standard

Rule 702 of the Federal Rules of Evidence provides that "a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. The rule also requires that such opinion testimony be "based upon sufficient facts or data" that are "the product of reliable principles and methods" which have been reliably applied "to the facts of the case." Fed. R. Evid. 702(b)-(d).

If a witness is qualified as an expert to provide opinion testimony on a subject, a two-part test governs the admissibility of expert testimony.  The evidence may be admitted if it "rests on a reliable foundation and is relevant." Daubert, 509 U.S. at 597. "Daubert demands . . . that the trial judge make a 'preliminary assessment' of whether the proffered testimony is both reliable (i.e. based on 'scientific knowledge') and helpful (i.e. of assistance to the trier of fact in understanding or determining a fact in issue." Maryland Cas. Co. v. Therm-O-Disc, Inc., 137 F.3d 780, 783 (4th Cir. 1998) (citing Daubert, 509 U.S. at 592). The Fourth Circuit has noted,

> As in all questions of admissibility, the proffering party must come forward with evidence from which the court can determine that the proffered testimony is properly admissible. However, there is no requirement in Daubert, or any other controlling authority, that the proffering party must 'prove' anything to the court before the testimony in question can be admitted.

Id.

Daubert mentions specific factors to guide the overall relevance and reliability determinations that apply to all expert evidence. They include (1) whether the particular

scientific theory "can be (and has been) tested;" (2) whether the theory "has been subjected to

peer review and publication;" (3) the "known or potential rate of error"; (4) the "existence and

maintenance of standards controlling the technique's operation;" and (5) whether the

technique has achieved "general acceptance" in the relevant scientific or expert community.

United States v. Crisp, 324 F.3d 261, 266 (4th Cir. 2003) (quoting Daubert, 509 U.S. at 593–

94). These factors are neither definitive nor exhaustive, "[a]s Daubert emphasized, the analysis

'must be a flexible one.'" Id. (citing Daubert, 509 U.S. at 593–94; Kumho Tire Co. v.

Carmichael, 526 U.S. 137, 141–142 (1999)).

> With respect to relevancy, Daubert also explains:
>
>> Expert testimony which does not relate to any issue in the case is
>> not relevant and, ergo, non-helpful. … The consideration has
>> been aptly described by Judge Becker as one of fit. Fit is not
>> always obvious, and scientific validity for one purpose is not
>> necessarily scientific validity for other, unrelated purposes. …
>> Rule 702's helpfulness standard requires a valid scientific
>> connection to the pertinent inquiry as a precondition to
>> admissibility.

Daubert, 509 U.S. at 591–92 (internal citations and quotation marks omitted).

> As evidentiary gatekeeper, the district court performs an important role. "[E]xpert

witnesses have the potential to be both powerful and quite misleading[;]" the court must

"ensure that any and all scientific testimony … is not only relevant, but reliable." Cooper v.

Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001) (citing Westberry v. Gislaved Gummi

AB, 178 F.3d 257, 261 (4th Cir. 1999), and Daubert, 509 U.S. at 588, 595). In cases proceeding

before a court, as here, rather than a jury, however, "the district court's evidentiary gatekeeping

function [is] relaxed, and the district court [is] in the best position to decide the proper weight

to give the expert opinions," as "'[t]here is less need for the gatekeeper to keep the gate when

the gatekeeper is keeping the gate only for himself.'" <u>United States v. Wood</u>, 741 F.3d 417,

425 (4th Cir. 2013) (quoting <u>United States v. Brown</u>, 415 F.3d 1257, 1269 (11th Cir. 2005)).

"Indeed, '[t]he 'gatekeeper' doctrine was designed to protect juries and is largely irrelevant in

the context of a bench trial.'" <u>Traxys N. Am., LLC v. Concept Mining, Inc.</u>, 808 F. Supp. 2d

851, 853 (W.D. Va. 2011) (quoting <u>Deal v. Hamilton Cnty. Bd. of Educ.</u>, 392 F.3d 840, 852

(6th Cir. 2004)).

### 2.    Analysis

Here, defendants offer the testimony of Kristina Kahan, a Registered Nurse, Certified

Professional Coder, and senior managing director at Ankura Consulting with "decades of

clinical, compliance, and coding experience in the healthcare industry," as an expert in the field

of healthcare billing and processing, to opine on whether or not the health insurance claims at

issue in this case were properly billed.  Defs. Daubert Opp. at 1. Plaintiff does not challenge

Kahan's qualifications as an expert; rather, plaintiff challenges the relevancy and helpfulness

of Kahan's opinions, and disputes that Kahan has offered a sufficient basis on which to offer

her opinions. <u>See</u> Pl. Daubert Mtn. Kahan appears to have sufficient experience, skill and

specialized knowledge in the field of healthcare billing and claims processing such that the

court may allow her to offer opinions under Fed. R. Evid. 702. <u>See</u> Expert Report of Kristina

Kahan, ECF No. 160-1 at 2–3, 22–28 (hereinafter "Kahan Rep."). The court therefore

proceeds with its analysis of plaintiff's other arguments.

#### a)    Basis for Opinions

In her report, Kahan concludes that Sentara properly submitted claims for the services

at issue in this case and that United properly adjudicated the claims it received from Sentara.

16

See Kahan Rep. ¶18–19. Specifically, Kahan concludes that Sentara appropriately billed the services rendered as originating from Sentara RMH Medical Center because the services were "performed at off-campus locations of RMH Medical Center and the blood testing was performed at RMH Medical Center's main hospital location" and thus constituted "facility services." Id. Kahan concludes that "[i]t is industry practice and standard for facilities to bill payors for facility services at off-campus departments on an institutional/UB claim form, as billed by RMH Medical Center for the two dates of service at issue." Id. Kahan also concludes that United "properly followed standard claims adjudication processes expected in the healthcare industry" in adjudicating plaintiff's claims from Sentara. Id. Kahan provides a variety of evidence supporting her conclusions.

As to her conclusion that EMHC and SMHC are off-campus locations of Sentara RMH Medical Center, Kahan points to Sentara RMH Medical Center's enrollment via Medicare's Provider Enrollment, Chain, and Ownership System ("PECOS"). Kahan Rep. ¶22. Kahan states that "[t]he PECOS enrollment document lists all addresses that are included as part of a hospital and that may bill under the hospital's CMS Certification Number ("CCN"), and that Sentara RMH Medical Center's PECOS enrollment includes both SMHC and EMHC. Id. (listing the location names as "East Market Outpatient Services" and "South Main Street"). Kahan also points to Sentara RMH Medical Center's hospital accreditation performed by Det Norske Veritas as further evidence that EMHC and SMHC are off-campus departments of Sentara RMH Medical Center. Id. ¶¶23–24. Kahan notes, "[w]hen a hospital is assessed and accredited, the accreditation is performed on all locations of the hospital." Id. ¶23. The hospital accreditation document includes both SMHC and EMHC. See Defs. Ex. PP at

SENTARA 00452 (listing "Sentara South Main Health Center" with site name of "SRMH Lab Services-South Main Health Cente[r]"); Defs. Ex. PP at SENTARA 0060 (listing "Sentara East Market Health Center" with site name of "SRMH Lab Services-East Market Health Cente[r]").

To support her conclusion that Sentara properly billed the two claims, Kahan explains the regulations and standards applicable to hospital claims billing. Kahan Rep. ¶¶27–33. Kahan explains that the Health Insurance Portability and Accountability Act ("HIPAA") requires that hospitals bill "payors for facility services according to industry standard methods and transaction code sets." Id. ¶28. Hospitals "are required to bill payors for hospital claims using the electronic ASC X12N-837I Health Care Claim, or the paper 1450 UB (Uniform Billing) form," while "physician practices are … required to bill all payors for services using the ASC X12N-837P Health Care Claim, with the equivalent paper claim being a 1500 billing form ("1500")." Id. "[T]he physician 1500 and institutional UB claim forms differ in multiple significant ways and include different types of information that are not interchangeable." Id. ¶33. Hospitals are required to submit these claims using the claims submission requirements issued by the Center for Medicare and Medicaid Services ("CMS") for hospitals. Id. ¶29.

To support her conclusion that United properly adjudicated the claims, Kahan explains that United used standard Claim Adjustment Reason Codes ("CARC") and Remittance Advice Remark Codes ("RARC") on its Remittance Advice ("RA") when communicating with Sentara RMH Medical Center. Kahan Rep. ¶35. Kahan further explains that "[i]n my experience with health insurance companies and their appeals procedures, United responded to [p]laintiff appropriately in response to his inquiries for both claims using the information available to them." Id. ¶39. Kahan comments, however, that "United did not appear to request medical

18

records from RMH Medical Center in its investigation of the claims, though, in my experience, this is consistent with common and widely accepted industry practice." Id. Kahan does not provide support beyond her experience for these latter two statements.

Plaintiff argues that because Kahan "never once cites or discusses Section 3.1 of the Facility Participation Agreement," "never discusses any … notice [by Sentara adding EMHC and SMHC to the FPA] or how the lack of a notice … adversely affects her conclusion," and "never once cites or discusses the pertinent sections[2] of the Medical Group Participation [Agreement]," Kahan improperly relies on ipse dixit to support her conclusion "that a claim form was properly submitted." Pl. Daubert Mtn. at 5–7. Plaintiff argues that Kahan must "identify why the claim form was submitted properly and in the context of the parties' contractual relationship." Id. at 7. Defendants counter that Kahan has provided sufficient bases for her opinions. Defs. Opp. Daubert at 7–9. Defendants argue that Kahan reviewed the FPA and MGPA, but has "no obligation" to discuss in her report how the FPA and MGPA affect her conclusions as "[n]o case law or other legal authority supports [p]laintiff's belief that Ms. Kahan… [is] required to address every term of an insurer's private contract with network providers in a case about a hospital and claims administrator's asserted obligations under ERISA," and that Kahan made the determination that "other facts and record evidence were most important to evaluating the appropriateness of the claims." Id. at 7–8. Defendants also argue that, even if the court disagrees with defendants' argument, Fourth Circuit case law demonstrates that these types of questions go to the weight and credibility of Kahan's report, not its admissibility. Id. at 8 (citing Bresler v. Wilmington Tr. Co., 855 F.3d 178, 195 (4th Cir.

---

[2] §§ 3.1, 4.6, and 5.13 according to plaintiff. See Pl. Daubert Mtn. at 6–7.

2017); <u>Burns v. Anderson</u>, 123 F. App'x 543, 549 (4th Cir. 2004)).  Plaintiff responds that "by not discussing the location limitation in the FPA that prohibited it from being used to determine the 'contracted fee' for the outpatient center blood draws, the Kahan Report does not present any basis for her answer to the question presented." Pl. Daubert Reply at 3. By this plaintiff argues that because the "core issue" before the court is rooted in the problem that "the [d]efendants agreed in writing that the FPA did not apply to any locations other than a specific list, and that the list could only be updated in a specific way, which [d]efendants failed to do," and Kahan failed to address this issue, Kahan's report lacks sufficient bases. <u>Id.</u>

The court finds that Kahan has developed sufficient bases on which to support her opinions. Kahan concludes that Sentara properly billed and United properly adjudicated the claims. In making these conclusions, Kahan evaluated Sentara RMH Medical Center's hospital certification and Medicare Provider Enrollment, Chain, and Ownership System information, which demonstrated to Kahan that EMHC and SMHC were off-campus departments of Sentara RMH Medical Center. Having confirmed that EMHC and SMHC were off-campus departments, Kahan then evaluated what types of claim forms would be appropriately submitted by EMHC and SMHC, and came to the conclusion that under relevant regulatory guidelines, appropriate submission forms would have been institutional UB forms. With that information, Kahan concluded that Sentara's use of the UB form to bill plaintiff's claims was appropriate. Kahan then reviewed the regulatory matrix surrounding claims adjudications and analyzed United's claims adjudication process as to plaintiff against this matrix. Kahan determined that United appropriately adjudicated the claim. Though Kahan did not address in her report the FPA or MGPA, Kahan's report stands on appropriate bases in that Kahan

substantiates her conclusion that the claim was appropriately billed. Though Kahan does not directly explain why the location or service plaintiff received was a hospital location, Kahan has shown that EMHC and SMHC are outpatient centers of a hospital, and that plaintiff received services at EMHC and SMHC. Thus, when Kahan concludes that Sentara appropriately billed United using a UB form, Kahan has sufficient basis to make that opinion. Whether or not Kahan should have discussed the FPA and/or MGPA in making her conclusions goes to the weight of her testimony, not its admissibility.

### b)    Relevancy and Helpfulness

Plaintiff argues that Kahan's report is not helpful to the court "in interpreting the plain meaning of the notice requirement of Section 3.1 [of the FPA]." Pl. Daubert Mtn. at 9. Therefore, "Kahan offers no testimony that is helpful or necessary for the [c]ourt to interpret the contract at issue," and thus, her testimony is not admissible. See id. at 7–9. Defendants counter that Kahan's "technical and specialized knowledge provides helpful background and information about the billing and processing of claims for health care services generally, and the billing and processing of claims for outpatient laboratory services by off-campus hospital departments specifically." Defs. Opp. Daubert at 9. Defendants argue that Kahan's report addresses material aspects of the case—whether Sentara appropriately submitted the claims and whether United appropriately adjudicated them. Id. Defendants also add that because this case will include a bench trial, "any concerns that Ms. Kahan's opinions may confuse or improperly influence a jury are wholly inapplicable." Id. at 11. In his reply, plaintiff restates his argument that the Kahan Report is "unnecessary" for the court to decide the ultimate issue in

the case, which plaintiff argues is the interpretation of the terms of the FPA and MGPA. Pl. Daubert Reply at 5.

The court finds that the Kahan Report presents relevant and helpful evidence as it serves to assist the court in understanding the healthcare claims submission and adjudication processes, including the relevant regulations governing these processes, such that the court is better equipped to address the issues in dispute in this case. The parties are correct that the court can read and interpret the contracts at issue, see Pl. Daubert Mtn. at 9 ("This [c]ourt can and must be the one to read the agreements…"); Defs. Opp. Daubert at 11 ("As the [c]ourt noted during the September 26, 2024 status conference, 'I can read these agreements as well as anybody, right? And in fact, I'm supposed to.'" (citing Sept. 26, 2024 Hearing Tr., ECF No. 115 at Pageid# 1764:20–21)), and the Kahan Report does not improperly delve into the world of contract interpretation. Thus, the court may consider the Kahan Report for its value in understanding the broader environment of the instant case.

The court therefore **DENIES** plaintiff's motion to exclude defendants' expert, ECF No. 133.

### C.    Motions for Summary Judgment

Having addressed plaintiff's motion to exclude the Kahan Report, the court proceeds to address United's motion for summary judgment, followed by Sentara's motion for summary judgment. For the reasons discussed below, the court **GRANTS** United's motion, ECF No. 129, and **GRANTS** Sentara's motion, ECF No. 130.

### 1.    Legal Standard

Under Federal Rule of Civil Procedure 56, the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" McAirlaids, Inc. v. Kimberly-Clark Corp., 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration

omitted) (quoting <u>Tolan v. Cotton</u>, 134 S. Ct. 1861, 1863 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." <u>Anderson</u>, 477 U.S. at 255.

The non-moving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" <u>Glynn</u>, 710 F.3d at 213 (quoting <u>Anderson</u>, 477 U.S. at 252). The non-moving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." <u>Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.</u>, 407 F.3d 631, 635 (4th Cir. 2005) (quoting <u>Anderson</u>, 477 U.S. at 249). "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." <u>Moss v. Parks Corp.</u>, 985 F.2d 736, 738 (4th Cir. 1993) (quoting <u>Anderson</u>, 477 U.S. at 248). Even when facts are not in dispute, the court cannot grant summary judgment unless there is "no genuine issue as to the inferences to be drawn from" those facts. <u>World-Wide Rights Ltd. P'ship v. Combe Inc.</u>, 955 F.2d 242, 244 (4th Cir. 1992).

### 2.    United's Motion for Summary Judgment

United moved for summary judgment on all counts. The court addresses each count in turn.

### a)    Count I

Count I is brought under 29 U.S.C. § 1132(a)(1)(B), as plaintiff seeks to recover benefits due to him under the terms of his plan. United argues that plaintiff is not entitled to any relief on the denial of benefits claim because he cannot prove United abused its discretion in processing his claims. United MSJ at 5. Plaintiff disagrees, arguing that United exercised

24

"willful blindness over the undisputed terms of its contract with Sentara that limits the applicability to only certain locations," and that that "willful blindness to its own contract shows an abuse of discretion." Pl. Opp. United at 3–4. Plaintiff further argues that, at minimum, he has raised a material issue of fact as to whether United has demonstrated that the blood draws were properly billed. Id. at 7–8. United counters that plaintiff cannot prove that United's application of the FPA rates was an abuse of discretion; that plaintiff's raising of miscellaneous provisions of the FPA and MGPA are both a misinterpretation and irrelevant to the question of whether plaintiff was improperly billed; that plaintiff has failed to meet his burden of showing that the claim determination was unsupported or unreasonable; and that United was not willfully blind. See United Reply at 3–14.

"Although ERISA itself is silent on the standard for denials of benefits challenged under § 1132(a)(1)(B), … a de novo standard applies 'unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan,' in which case the exercise of assigned discretion is reviewed for abuse of discretion." Evans v. Eaton Corp. Long Term Disability Plan, 514 F.3d 315, 321 (4th Cir. 2008) (citing Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 111, 115 (1989) and Booth v. Wal–Mart Stores, Inc., 201 F.3d 335, 341–42 (4th Cir.2000)). Here, plaintiff's plan includes an ERISA Statement. See 2019 Plan at Pageid# 260–261; 2021 Plan at Pageid# 453–454. The ERISA Statement contains an identical rider in both the 2019 and 2021 plans that states:

> Discretionary Authority of Plan Administrator and Other Plan Fiduciaries: The Plan Administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for benefits in accordance with

> the terms of the Plan. Any interpretation or determination made
> according to such discretionary authority shall be given deference
> and be legally binding on all parties and subject to review by a
> legal authority only to the extent the decision was arbitrary and
> capricious.

Id. The Plan Administrator of the plans is Rosetta Stone, Ltd., plaintiff's then-employer. Id.

Under the Plan, "[b]enefits are provided under a group insurance contract entered into

between your Plan Sponsor and UnitedHealthcare. Claims for benefits are sent to

UnitedHealthcare. Your employer and UnitedHealthcare share responsibility for administering

the plan." Id. UnitedHealthcare Insurance Company is identified as the Plan's Claims

Fiduciary, and was assigned that responsibility by the Plan Sponsor. Id. Thus, the de novo

standard does not apply as United has been assigned discretionary authority under the Plan as

a Claims Fiduciary. See DSOF ¶¶4–5; see also Evans, 514 F.3d at 321 (applying abuse of

discretion standard where "Plan's language giving [plan administrator] 'discretionary authority

to determine eligibility for benefits' and 'the power and discretion to determine all questions

of fact ... arising in connection with the administration, interpretation and application of the

Plan.'"). The court thus reviews the benefits denial decision under an abuse of discretion

standard. See Hooper v. UnitedHealthcare Ins. Co., 694 F. App'x 902, 907 (4th Cir. 2017);

Evans, 514 F.3d at 321.

"It is notoriously difficult to venture a general definition of the term 'abuse of

discretion.'" Evans, 514 F.3d at 321–322. The Fourth Circuit has stated:

> First, in ERISA cases, the standard equates to reasonableness: We
> will not disturb an ERISA administrator's discretionary decision
> if it is reasonable, and will reverse or remand if it is not. …
> Second, the abuse of discretion standard is less deferential to
> administrators than an arbitrary and capricious standard would
> be; to be unreasonable is not so extreme as to be irrational. …

> Third, an administrator's decision is reasonable "if it is the result
> of a deliberate, principled reasoning process and if it is supported
> by substantial evidence." Bernstein v. CapitalCare, Inc., 70 F.3d
> 783, 788 (4th Cir.1995) (internal quotation omitted). Fourth, the
> decision must reflect careful attention to "the language of the
> plan," as well as the requirements of ERISA itself.

Id. at 322–323 (select internal citations omitted). "[O]n the whole … we require ERISA administrators' decisions to adhere both to the text of ERISA and the plan to which they have contracted; to rest on good evidence and sound reasoning; and to result from a fair and searching process." Id.; see also Hooper, 694 F. App'x at 907. When reviewing the plan administrator's decision for reasonableness, the court considers eight factors:

> (1) the language of the plan; (2) the purposes and goals of the
> plan; (3) the adequacy of the materials considered to make the
> decision and the degree to which they support it; (4) whether the
> fiduciary's interpretation was consistent with other provisions in
> the plan and with earlier interpretations of the plan; (5) whether
> the decisionmaking process was reasoned and principled; (6)
> whether the decision was consistent with the procedural and
> substantive requirements of ERISA; (7) any external standard
> relevant to the exercise of discretion; and (8) the fiduciary's
> motives and any conflict of interest it may have.

Booth, 201 F.3d at 342–343. When evaluating the factors, "[g]enerally, consideration of evidence outside the administrative record is inappropriate." Helton v. AT&T Inc., 709 F.3d 343, 352 (4th Cir. 2013) (citing Sheppard & Enoch Pratt Hosp. v. Travelers Ins. Co., 32 F.3d 120, 125 (4th Cir. 1994)). "The rationale for this rule is that, to the extent possible, the administration of ERISA plans should be left to plan fiduciaries, not federal courts." Id. The Fourth Circuit has recognized only a limited exception to this rule—"[a] district court may consider evidence outside of the administrative record on abuse of discretion review in an ERISA case when [1] such evidence is necessary to adequately assess the Booth factors and

[2] the evidence was known to the plan administrator when it rendered its benefits determination." Hooper, 694 F. App'x at 907–908 (alterations adopted, quoting Helton, 709 F.3d at 356). Under the abuse of discretion standard, plaintiff has the burden of demonstrating that United's decision was unreasonable. McCall v. Am. Elec. Power System Long Term Disability Plan, No. 7:11-CV-00449, 2012 WL 2236669, *3 (W.D. Va. June 15, 2012) (citing Marcum v. Zimmer, 887 F.Supp. 891, 896 (S.D.W.Va. 1995) and Saah v. Contel, 780 F. Supp. 311, 315 (D. Md. 1991), aff'd, 978 F.2d 1256 (4th Cir.1992)); Foggie v. Am. Nat'l Red Cross Long Term Disability Plan, No. 1:21-cv-001, 2022 WL 3580745, *7–8 (E.D. Va. Aug. 18, 2022) (citing Case v. Cont'l Cas. Co., 289 F. Supp. 2d 732, 737 (E.D. Va. 2003)).

This section proceeds by reviewing the Booth factors as applied to the instant case, followed by plaintiff's arguments regarding willful blindness and facts remaining in dispute. The court notes that "not all of the Booth factors are relevant in every case, and an express discussion of each factor is unnecessary." Weisman v. Guardian Life Ins. Co. of Am., 710 F. Supp. 3d 537, 546 (W.D. Va. 2024) (citing Helton, 709 F.3d at 357). Thus, the section below discusses the four factors the court finds most relevant to its analysis.

### (1)    Booth Factors

The first Booth factor is the language of the plan. See Booth, 201 F.3d 335 at 342. Here, the Plan does not refer to the MGPA or FPA. Instead, the Plan refers to "Benefits" and "Covered Services," which United provides according to the "contracted fee(s)" it has with specific providers. See 2019 Plan at Pageid# 122 (discussing allowed amounts); see also id. at Pageid# 186 (discussing allowed amounts in the context of continuity of care). The Plan also explicitly states, "[d]o not assume that a Network provider's agreement includes all Covered

Health Care Services. Some Network providers contract with us to provide only certain Covered Health Care Services, but not all Covered Health Care Services." Id. at Pageid# 124; see also id. at Pageid# 203–204 (similar). The Plan confirms that United has "the final authority" to "[i]nterpret Benefits and other terms, limitations, and exclusions" set out in the policy, and "[m]ake factual determinations relating to Benefits." Id. at Pageid# 131. The Plan states that plaintiff could have requested information on United's reimbursement policies by contacting United. Id. at Pageid# 132. The Plan states that United conducts "error, abuse and fraud reviews," prior to applying its reimbursement policies to billings from "certain" providers. Id. As to outpatient lab services, the Plan states that the benefits include the facility charge and the charge for supplies and equipment, among other charges. See id. at Pageid# 143. The Plan does not refer to specific locations for lab services.

Plaintiff's allegation is that "[t]he plan benefits included that medical services done at an outpatient center as ordered by a provider associated with [the] Medical Group Participation Agreement would be billed pursuant to the negotiated rate applicable to the Medical Group Participation Agreement," and United "failed in its duty to properly process the claims such that Plaintiff and all putative class members were overcharged" by not using the MGPA rate. Compl. ¶¶121, 128. As the Plan does not mention the MGPA and also provides United the "final authority" to interpret and make factual determinations regarding the Plan, the Plan language weighs in favor of finding United's decision reasonable.

As to the third and fifth Booth factors, regarding the adequacy of materials considered and whether the decision-making process was reasoned and principled, respectively, see Booth, 201 F.3d at 342, United appears to have referenced adequate materials in making its

29

determination. See DSOF ¶¶125–129 (describing the appeals process for the 2021 claim, and noting the materials received and/or reviewed included letter(s) from plaintiff, "printouts of cost estimates" obtained from the cost estimate tool, a copy of plaintiff's Sentara billing account, United's payment policies and limitations under the plan, the explanation of benefits, the "claim image," an online routing system record related to the test, and other materials); see also PODSOF at 12 (not disputing DSOF ¶¶125–129). United also appears to have conducted a reasoned and principled process—United "carefully reviewed the documentation submitted, our payment policies and the limitations, exclusions, and other terms of [Plaintiff's] Benefit Plan," and addressed the naming discrepancy between the cost estimates plaintiff submitted and the provider who ultimately billed the services. See id. The Virginia Bureau of Insurance also ultimately agreed with United's determination, which underscores that United conducted a principled process guided by review of sufficient documentation. See DSOF ¶¶130–136 (regarding 2019 and 2021 claims); see also PODSOF at 12 (not disputing DSOF ¶¶130–136). Plaintiff does not raise counter arguments (beyond willful blindness) as to why the third and fifth Booth factors should not weigh in favor of finding United's finding reasonable. See generally Pl. Opp. United. Thus, the adequacy of the materials considered by United, the degree to which those materials supported United's decision, and the process by which United made the decision weigh in favor of finding United's finding was reasonable.

As to the eighth Booth factor, regarding the fiduciary's motives and conflicts of interest, if any, see Booth, 201 F.3d at 343, United does not appear to have had a conflict of interest. See United MSJ at 13 (noting that "[i]f United agreed with Plaintiff's appeal of his claim, United's payment would be less than what United paid on the original claim." (emphasis

in original)). It is unclear what ulterior motive United would have had, and plaintiff does not address this argument in his briefing. Thus, the lack of conflict of interest also seemingly weighs in favor of finding United's decision reasonable.

When evaluating these factors under the standard set forth in Booth, the court finds that United's decision was reasonable. The court does not address the remaining Booth factors, factors two, four, six and seven, as these factors do not impact the court's evaluation of the facts in this case.

### (2)    Willful Blindness

Plaintiff does not address the Booth factors in-depth in his opposition; instead, plaintiff argues that United was willfully blind to evidence contrary to its decision. See Pl. Opp. United at 3–11. Plaintiff cites Harrison v. Wells Fargo Bank, N.A., 773 F.3d 15 (4th Cir. 2014), in support of his argument. See id. at 9–11. In Harrison, the Fourth Circuit held that the defendant plan administrator's review process of the plaintiff's discontinuation of disability benefits did not satisfy "ERISA's full and fair review requirements," where the defendant plan administrator was repeatedly put on notice that the record before it was not sufficient to render a decision. Harrison, 773 F.3d at 22–23. In that case, the defendant engaged an independent reviewer to assess plaintiff's claim, and the independent reviewer stated the record was incomplete. Id. Both the independent reviewer and the defendant had the contact information and/or were made aware of an additional doctor who could speak to plaintiff's mental health status, and thus provide a fuller record on which to render a decision, but the plan administrator denied the benefits before contacting that doctor. Id. The plan administrator also failed in its duty to request additional information from the plaintiff, if it felt that

additional information was needed to render a decision. Id. at 23–24. The Fourth Circuit noted, "the primary responsibility for providing medical evidence to support a claimant's theory rests with the claimant… [h]owever, once a plan administrator is on notice that readily-available evidence exists that might confirm claimant's theory of disability, it cannot shut its eyes to such evidence where there is little in the record to suggest the claim deficient." Id. at 24. The Fourth Circuit referred to this holding by saying, "[l]ike our sister circuits, we now adopt this narrow principle—narrow because it does not undercut claimant's responsibility to provide medical information nor impose a duty on plan administrators to fish for medical information on the mere possibility that it may be helpful in some remote way." Id. at 24–25.

United sought to distinguish Harrison on the grounds that "[p]laintiff did not provide any evidence in his appeals that supported his complaints about the way his claims were billed or adjudicated," such that there was nothing presented to United indicating to United that it was willfully blind. See United Reply at 12–13; Apr. 23, 2025 Hearing Tr., ECF No. 158 at 37:10–38:2. United argued that rather than being willfully blind, "United simply disagreed with [p]laintiff's unsubstantiated speculation about how his claims should have been billed." Id. at 13.

Though plaintiff argues United was willfully blind to the MGPA and FPA, under a plain reading of the Plan, United had the discretionary authority to make factual determinations and benefits interpretations in applying the "contracted fee(s)" it has with providers. See 2019 Plan at Pageid# 122. Thus, if the bill United received fell under the FPA, then United had the authority to apply the contracted fees of the FPA. According to the facts in the record, United was not missing or directly ignoring information in making its benefits

32

determination, nor did United appear to remark on any missing information such that this case would be analogous to Harrison. Plaintiff also argues that United was willfully blind to plaintiff's claims that plaintiff's 2019 blood draw "was done at the East Market Street Health Center," as plaintiff informed United's representative via telephone call, and again in his first and second level appeals to United. See Pl. Opp. United at 10; see also id. at 10–11 (discussing plaintiff putting United on notice that the 2021 blood draw occurred at the South Main Health Center). However, United had the discretionary authority to make factual determinations regarding these visits. Thus, United had the authority to determine whether the provider indicated by Sentara was appropriate regardless of the location of the blood draw. Though plaintiff argues that "[n]one of UHC's responses ever addressed the location" issue, Pl. Opp. United at 11, that is factually not of strong importance when viewed alongside the fact both Sentara RMH Medical Group and Sentara RMH Medical Center operated at both EMHC and SMHC (a fact United would have the authority under the Plan to determine). Therefore, the court finds that United was not willfully blind under the Harrison framework.

### (3)    No Facts Remain in Dispute as to Count I

Plaintiff argues there remain genuine disputes of material fact as to whether the claims were properly billed as "[p]laintiff has provided evidence showing that the physical address of the two outpatient centers were never added by Sentara to the FPA," "whether the Sentara Defendants misrepresented the location of the blood draws," whether "[the claims] could have, and in fact should have, been billed under the MGPA," and whether United was "willfully blind to the fact that the blood draws were not performed at a location covered by the FPA." Pl. Opp. United at 5, 7–11. The court has addressed plaintiff's willful blindness

33

argument in the prior section, and the three remaining issues do not affect the court's legal analysis of United's argument as to Count I, because these three alleged facts in dispute are not implicated by the Count I analysis as to United. Therefore, because the court "will not disturb a plan administrator's decision if the decision is reasonable, even if [the court] would have come to a contrary conclusion independently," Evans v. Standard Ins. Co., 449 F. Supp. 3d 605, 614 (W.D. Va. 2020), and here, under the Booth factors, United's decision was reasonable, the court **GRANTS** United's motion for summary judgment as to Count I.

### b)    Count II

Count II is brought under 29 U.S.C. § 1132(a)(3) which permits a civil action "by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3). Plaintiff bases his United-specific allegations in Count II on United's alleged misprogramming of its cost estimate website and mistraining of its agents. Compl. ¶¶133–134. United moves for summary judgment on Count II, arguing that United did not act as a fiduciary when it provided cost estimates to plaintiff and that United did not make any material misrepresentations to plaintiff. See United MSJ at 14–20. United argues that any reliance by plaintiff on the cost estimates was objectively unreasonable and that plaintiff's requested relief, entitlement to contracted rates from providers who, United argues, did not perform his services, is not available. Id. Plaintiff counters that United can be held liable for its misrepresentations, and, at minimum, plaintiff has raised a material issue of fact as to whether United made material misrepresentations about the cost of the blood draws

and about whether plaintiff's reliance on the cost estimates was reasonable. <u>See</u> Pl. Opp. United at 11–16. United disputes that plaintiff has raised a genuine issue of material fact as to the alleged misrepresentations. <u>See</u> United Reply at 15–18.

29 U.S.C. § 1132(a)(3) is a "catchall" provision that "acts as a safety net, offering appropriate equitable relief for injuries caused by violations that §502 does not elsewhere adequately remedy." <u>Peters v. Aetna Inc.</u>, 2 F.4th 199, 216 (4th Cir. 2021) (alterations adopted, quoting <u>Varity Corp. v. Howe</u>, 516 U.S. 489, 512, 116 S. Ct. 1065, 134 L. Ed. 2d 130 (1996)). "In order to establish a claim for breach of fiduciary duty based on alleged misrepresentations, a plaintiff must show: 1) that a defendant was a fiduciary of the ERISA plan, 2) that a defendant breached its fiduciary responsibilities under the plan, and 3) that the participant is in need of injunctive or other appropriate equitable relief to remedy the violation or enforce the plan." <u>Adams v. Brink's Co.</u>, 261 F. App'x 583, 589–590 (4th Cir. 2008) (citing <u>Griggs v. E.I. DuPont de Nemours & Co.</u>, 237 F.3d 371, 379–380 (4th Cir. 2001) and <u>Blair v. Young Phillips Corp.</u>, 235 F.Supp.2d 465, 470 (M.D.N.C. 2002)).

"A 'person is a fiduciary with respect to a plan,' and therefore subject to ERISA fiduciary duties, 'to the extent' that he or she 'exercises any discretionary authority or discretionary control respecting management' of the plan, or 'has any discretionary authority or discretionary responsibility in the administration' of the plan." <u>Adams</u>, 261 F. App'x at 590 (quoting <u>Varity</u>, 516 U.S. at 489). "ERISA contemplates two general types of fiduciaries… The first type is a 'named fiduciary,' … The second type of fiduciary contemplated by ERISA has been called a 'functional fiduciary.'" <u>Dawson-Murdock v. Nat'l Counseling Grp., Inc.</u>, 931 F.3d 269, 275 (4th Cir. 2019) (citing 29 U.S.C. § 1102(a)(2) as to named fiduciaries, and 29

U.S.C. § 1002(21)(A) as to functional). "[T]he term 'named fiduciary' means a fiduciary who is

named in the plan instrument, or who, … is identified as a fiduciary" by an employer or

employee organization with respect to the plan or when acting jointly. 29 U.S.C. § 1102(a)(2).

A functional fiduciary is:

> [A] person is a fiduciary with respect to a plan to the extent (i) he
> exercises any discretionary authority or discretionary control
> respecting management of such plan or exercises any authority
> or control respecting management or disposition of its assets, (ii)
> he renders investment advice for a fee or other compensation,
> direct or indirect, with respect to any moneys or other property
> of such plan, or has any authority or responsibility to do so, or
> (iii) he has any discretionary authority or discretionary
> responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). Fiduciary status, however, "is not an all-or-nothing concept. The

inclusion of the phrase 'to the extent' in 29 U.S.C. § 1002(21)(A) means a party is a fiduciary

only as to the activities which bring the person within the definition." Adams, 261 F. App'x at

590 (citing Coleman v. Nationwide Life Ins. Co., 969 F.2d 54, 60–61 (4th Cir. 1992)). In other

words, "an entity can be a fiduciary for some activities and not others." Gordon v. CIGNA

Corp., 890 F.3d 463, 474 (4th Cir. 2018). When determining fiduciary status, the court looks

first to the language of the plan, using the functional fiduciary definition as guideposts for

whether or not the plan language affords fiduciary status as to the acts in question. Id. at 475–

476. If the court is not assured of fiduciary status through examination of the plan language,

the court should also "look beyond the formalities to see if [the insurance company] in fact

exercised authority over these sorts" of activities. Id. at 476.

    Before the court addresses whether United was a fiduciary as to the acts implicated in

Count II, the court dispenses with plaintiff's argument that Count II is actionable against the

United defendants as a common law fraudulent misrepresentation claim. Plaintiff argues that the court need not evaluate Count II as a breach of fiduciary duty claim because plaintiff "is bringing a fraudulent misrepresentation claim against the United Defendants because of their misrepresentations, and nothing in this Court's prior rulings requires that it be for breach of fiduciary duty." Pl. Opp. United at 14. Plaintiff argues that under the court's motion to dismiss opinion, which held that Sentara's lack of fiduciary status does not insulate Sentara from the reach of ERISA, his claim is properly brought. Id. The court's motion to dismiss ruling does not extend to plaintiff's argument for multiple reasons. First, United is a named fiduciary under the plan. See 2021 Plan at Pageid# 453. Thus, a claim relating to fraudulent misrepresentations under 29 U.S.C. § 1132(a)(3) must grapple with United's fiduciary status. Second, and as the court discusses in further detail in § II.C.3, infra, though § 502(a)(3) claims are actionable against non-fiduciaries in certain contexts, like prohibited transactions under 29 U.S.C. § 1106, the case before the court is not such a context. Thus, in order for plaintiff's § 502(a)(3) claim to lie against United, United must be a fiduciary. See Adams, 261 F. App'x at 589 ("The United States Supreme Court has recognized the rights of an individual participant to sue a person acting as a fiduciary under an ERISA plan for breach of fiduciary duty, and to seek relief pursuant to 29 U.S.C. § 1132(a)(3)." (citing Varity, 516 U.S. at 489)).

Returning to the claim before the court, the court notes that the parties have different interpretations of what the acts implicated by Count II are. United argues it is not a fiduciary as to the acts implicated in Count II, "[b]ecause in providing the cost estimate[s], United does not have discretion," as compared to when United engages in the "discretionary act of actually adjudicating a claim" as the Claims Fiduciary. See Apr. 23, 2025 Hearing Tr., ECF No. 158 at

30:19–31:7. Plaintiff counters that because United, "under its Plan duties to check the credentialing of its network providers, and the Plan direction that its insureds like [p]laintiff should contact it to determine which services a network provider can provide," United's "website and employees were engaged in its fiduciary functions" when they informed plaintiff "the blood tests could be obtained at the outpatient centers." Pl. Opp. United at 15. Thus, as the court considers fiduciary status, it must consider whether United was acting as a fiduciary in both the act of providing estimates and the act of verifying the credentials of network providers.

The court first looks to the language of the Plan. The Plan states that United is the Plan's Claims Fiduciary. See 2019 Plan at Pageid# 260. The Plan makes this assignment in its "ERISA Statement" which notes, "[i]f the Group is subject to ERISA, the following information applies to you." Id. The Plan states,

> Claims Fiduciary: UnitedHealthcare Insurance Company ("UnitedHealthcare," refer to your Certificate of Coverage for details on the legal entity that provides your coverage) is your Plan's Claims Fiduciary and has been assigned this responsibility by your Plan Sponsor. Your Claims Fiduciary has the authority to require eligible individuals to furnish it with information necessary for the proper administration of your Plan.

Id. The Plan lists Rosetta Stone, Ltd. as the Plan Administrator. Id. Though Rosetta Stone is the Plan Administrator, the Plan notes that the Plan is administered jointly with United. Id. Specifically, the Plan states:

> Type of Administration of the Plan: Your Plan is fully insured. Benefits are provided under a group insurance contract entered into between your Plan Sponsor and UnitedHealthcare. Claims for benefits are sent to UnitedHealthcare. Your employer and UnitedHealthcare share responsibility for administering the plan.

Id. The Plan also discusses the discretion of the Plan Administrator and "Other Plan Fiduciaries." Id. The Plan notes,

> Discretionary Authority of Plan Administrator and Other Plan Fiduciaries: The Plan Administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for benefits in accordance with the terms of the Plan. Any interpretation or determination made according to such discretionary authority shall be given deference and be legally binding on all parties and subject to review by a legal authority only to the extent the decision was arbitrary and capricious.

Id. In sum, based on the Plan language, United is a Claims Fiduciary that shares plan administration responsibilities with the Plan Administrator and has discretionary authority to interpret the Plan.

Though United is a named fiduciary, the court's analysis does not end there, because "an entity can be a fiduciary for some activities and not others." Gordon, 890 F.3d at 474.[3]

---

[3] In Gordon, the Fourth Circuit evaluated whether the designated "Claim Fiduciary," who was assigned that responsibility by the plan administrator, acted as a fiduciary when allegedly failing to notify the insured that he needed to submit additional evidence of insurability. Gordon, 890 F.3d at 467–470 (at summary judgment stage). But, unlike here, the plan at issue in Gordon specifically carved out a limited fiduciary role for the Claim Fiduciary. See id. ("notwithstanding LINA's role as a fiduciary with respect to claims adjudication, the form explicitly stated that it 'does not authorize [the] Claim Fiduciary any fiduciary responsibility with respect to the administration of the Plan except as provided' in the Claim Fiduciary form.").

The Fourth Circuit later distinguished its analysis in Gordon. In Dawson, the Fourth Circuit evaluated whether a plan administrator and named fiduciary acted as a fiduciary when it allegedly failed to inform the insured about his continued eligibility under a life insurance plan. See Dawson, 931 F.3d at 272–274 (at motion to dismiss stage). The Fourth Circuit vacated the lower court's ruling on the basis that the plan administrator and named fiduciary could not disclaim its role as a fiduciary as it was both the named fiduciary of the plan and operating as a functional fiduciary as to the acts in question. See id. at 276–280. The Fourth Circuit noted that "[o]ur precedents on the topic of fiduciary capacity under ERISA have addressed primarily the nature of a functional fiduciary," and thus the lower court's use in Dawson of functional fiduciary precedents similar to Gordon was improper where the issue before the court dealt with a named fiduciary. See id. at 276–277. The Fourth Circuit added, "[t]o the extent that our decisions have said that 'being a fiduciary under ERISA is not an all-or-nothing situation,' our Court has never done so in the context of assessing whether a plan administrator and a named fiduciary is, in fact, a fiduciary. … Our precedents should not … be unduly expanded to suggest that an entity that serves as both the plan administrator and the named fiduciary for an ERISA-

Thus, the court must determine whether the activities at issue in this case fall into United's fiduciary responsibilities under the Plan. As noted above, the court must determine both whether the act of providing estimates and the act of verifying credentials fall into United's Plan responsibilities. The court again looks first to the Plan language. As to credentialing, plaintiff points to the Schedule of Benefits in the Plan. See Pl. Opp. United at 15. The Schedule of Benefits includes a section on United's "Provider Network." See 2019 Plan at Pageid# 123–124. In that section, the Plan states:

> We arrange for health care providers to take part in a Network. Network providers are independent practitioners. They are not our employees. It is your responsibility to choose your provider.

---

covered plan is not an ERISA fiduciary. Doing so would ignore ERISA's indisputable recognition of named fiduciaries." Id. at 277 (emphasis in original).

Thus, there is some question as to whether it is appropriate to perform a functional analysis as to United because United is named in the Plan as a fiduciary. See 29 U.S.C. § 1102(a). Despite this uncertainty, the Fourth Circuit also remarked in Dawson that it was "not suggesting that a plan administrator and named fiduciary (serving in those dual roles) will be subject to suit for breach of fiduciary duty as to all plan-related actions." Id. at 278 n. 13. The Fourth Circuit highlighted that "liability might be limited by the exercise of authority or control over only certain plan-related activities," and commented that "there is no liability for breach of fiduciary duty if the challenged conduct of the plan administrator and named fiduciary is not fiduciary in nature, as there … can be no breach of a nonexistent fiduciary duty." Id. This language from Dawson is in accord with rulings from the First and Ninth Circuits where courts have held that named fiduciaries could only be held liable for breach of fiduciary duty where "the alleged wrong … occur[red] in connection with the performance of a fiduciary function." See, e.g., Bafford v. Northrop Grumman Corp., 994 F.3d 1020, 1026–1028 (9th Cir. 2021); Livick v. The Gillette Co., 524 F.3d 24, 27–30 (1st Cir. 2008) ("A fiduciary named in an ERISA plan can undertake non-fiduciary duties…").

Here, Rosetta Stone, Ltd., is the "Plan Sponsor and Named Fiduciary" of the Plan. 2019 Plan at Pageid#260. In that role, Rosetta Stone has assigned to United the responsibility of "Claims Fiduciary." Id. The Plan also states that United and Rosetta Stone "share responsibility for administering the Plan." Id. Thus, United is neither the sole named fiduciary of the Plan, nor a claims fiduciary with no other responsibilities. Because of this, this case is different from both Gordon and Dawson as United does not have as limited a role by the Plan language as the defendant in Gordon, nor as expansive a role as the defendant in Dawson. The court therefore finds it appropriate to evaluate, using a functional analysis, whether United was acting as a fiduciary at the times in question. The court does so in recognition of ERISA's focus on the function of fiduciaries. See, e.g., DiFelice v. U.S. Airways, Inc., 497 F.3d 410, 418 (4th Cir. 2007) ("ERISA fiduciaries owe these duties only when they are acting in their capacity as a fiduciary. … In other words, we apply a functional analysis in determining if a party acts as a fiduciary and owes fiduciary duties with regard to particular conduct." (citing in part Pegram v. Herdrich, 530 U.S. 211, 226, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000))).

> Our credentialing process confirms public information about the providers' licenses and other credentials, but does not assure the quality of the services provided.
>
> Before obtaining services you should always verify the Network status of a provider. A provider's status may change. You can verify the provider's status by calling the telephone number on your ID card. A directory of providers is available by contacting us at www.myuhc.com or the telephone number on your ID card to request a copy.
>
> It is possible that you might not be able to obtain services from a particular Network provider. The network of providers is subject to change. Or you might find that a particular Network provider may not be accepting new patients. If a provider leaves the Network or is otherwise not available to you, you must choose another Network provider to get Network Benefits.
>
> If you are currently undergoing a course of treatment using an out-of-Network Physician or health care facility, you may be eligible to receive transition of care Benefits. This transition period is available for specific medical services and for limited periods of time. If you have questions regarding this transition of care reimbursement policy or would like help to find out if you are eligible for transition of care Benefits, please call the telephone number on your ID card.
>
> Do not assume that a Network provider's agreement includes all Covered Health Care Services. Some Network providers contract with us to provide only certain Covered Health Care Services, but not all Covered Health Care Services. Some Network providers choose to be a Network provider for only some of our products. Refer to your provider directory or contact us for help.

Id. Plaintiff highlights specifically two lines from this section: (1) "Our credentialing process confirms public information about the providers' licenses and other credentials, but does not assure the quality of the services provided"; and (2) "Some Network providers contract with us to provide only certain Covered Health Care Services, but not all Covered Health Care Services. Some Network providers choose to be a Network provider for only some of our

products. Refer to your provider directory or contact us for help." Pl. Opp. United at 15. The Plan references United's credentialing elsewhere in the Plan, including in the section on "General Legal Provisions," see 2019 Plan at Pageid# 191, but does not mention credentialing in United's "Our Responsibilities" section, nor in the ERISA Statement. See id. at Pageid# 131–132, 260–261.

The question then is whether United's credentialing process falls into United's fiduciary duties under the Plan. The court finds that it does not. First, United is a "Claims Fiduciary" under the Plan. This means that United has the "discretionary authority to interpret the terms of the Plan and to determine eligibility for benefits in accordance with the terms of the Plan." 2019 Plan at Pageid# 260. The Plan language states that United has the responsibility to "Determine Benefits," "Pay for Our Portion of the Cost of Covered Health Care Services," "Pay Network Providers," "Pay for Covered Health Care Services Provided by Out-of-Network Providers," "Review and Determine Benefits in Accordance with Our Reimbursement Policies," and "Offer Health Education Services to You." Id. at Pageid# 131–132. The Plan does not state that United acts as a fiduciary when United "check[s] the credentialing of its network providers." Pl. Opp. United at 15.

Second, checking the credentialing of network providers does not appear to fall into the scheme of responsibilities envisioned as fiduciary under 29 U.S.C. § 1002(21)(A) because the act of checking the public credentials of network providers is not an act where United would exercise "discretionary authority or discretionary control respecting the management" or "in the administration" of the plan. 29 U.S.C. § 1002(21)(A)(i), (iii). Though the Plan notes that United and the Plan Administrator "share responsibility for administering the plan," 2019

Plan at Pageid# 260, checking the public credentials of network providers is not the type of act normally considered as a fiduciary responsibility to administer the plan. See, e.g., Gordon, 890 F.3d at 473–476 (in case where plan language excluded claims fiduciary from plan administration responsibilities, finding that plan administrator held the fiduciary responsibility to solicit additional materials from employee so that employee could gain full insurance coverage under the plan); Coleman, 969 F.2d at 60–63 (finding that insurance company was not delegated by the plan "authority or responsibility" to provide certain notifications to beneficiaries of circumstances that would affect availability of benefits). Additionally, the Plan's statement of discretionary authority of fiduciaries does not seem to extend to the act of checking the public credentials of network providers. The Plan states that "other Plan fiduciaries," like United as Claims Fiduciary, "shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for benefits in accordance with the terms of the Plan." 2019 Plan at Pageid# 260. Thus, United's discretionary authority and responsibility is cabined by the Plan to interpretation of the Plan and determination of eligibility for benefits in accordance with the Plan. Checking the credentials of network providers falls outside of this limited discretion and responsibility.

Third, plaintiff has not raised a genuine issue of material fact regarding United's fiduciary status as to the act of checking public credentials. This is not a case like Peters where there is a genuine dispute of material fact as to whether the insurance company was a functional fiduciary as to the acts in question. In Peters, the Fourth Circuit held that the plaintiff had put forth sufficient evidence to raise a dispute of material fact that the insurance company was a functional fiduciary as to the act of a subcontractor passing on a fee to patients

43

in violation of the plan language. Peters, 2 F.4th at 232–235. The Fourth Circuit made this finding because the plaintiff had shown that the fee was added by the subcontractor at the insurance company's direction and/or discretion. Id. Here, plaintiff has not provided evidence regarding United's checking of public credentials. See PODSOF at PSOF 1–45. Notably, plaintiff's statement of material facts precluding summary judgment only includes a glancing discussion of the credentialing issue. See id. at PSOF 37–39. Though plaintiff's burden is only to establish that specific material facts remain in dispute, see Matsushita, 475 U.S. at 586–87, plaintiff has not carried that burden on this issue.

Finding that there is no genuine issue of material fact that United did not act as a fiduciary when checking the public credentials of network providers, the court next examines whether United acted as a fiduciary as to the act of providing estimates. As before, the court turns first to the language of the Plan. The Plan does not explicitly afford United the responsibility to provide estimates in the ERISA statement, in the General Legal Provisions section, or in the "Our Responsibilities" section. See 2019 Plan at Pageid# 131–132, 191–196, 260–261. Though the Plan does state in the Schedule of Benefits, and elsewhere, that insureds should "contact us for help," see, e.g., id. at Pageid# 124, a fact which plaintiff highlights as an indicator of United's fiduciary responsibility to provide estimates, see Pl. Opp. United at 15–16, the Plan does not explicitly state that United is responsible for providing estimates of covered services to insureds.

Finding that the Plan does not explicitly state that United has the fiduciary responsibility to provide estimates, the court next examines whether under 29 U.S.C. § 1002(21)(A) United has "discretionary authority or discretionary control" as to this act. In

both the telephone conversations plaintiff had with United customer service representatives, and in the estimates United provided through its online tool, United, both itself and through its employees, did not have discretionary authority or discretionary control because the estimates it provided were predetermined rates from fee schedules between United and the Sentara entities. For example, the United representative plaintiff spoke with on June 17, 2021, confirmed with plaintiff that plaintiff was seeking estimates directly from a fee schedule. See Defs. Ex. MM at 6:7–15 (plaintiff confirming "Yes, that's right. Yes." when asked by a United representative, "Are you trying to see if we can pull up their fee schedule for your labs that they're going to do?"); id. at 6:17–8:2 (plaintiff providing United representative CPT codes and United representative responding with estimated amounts). The amounts listed in the estimates plaintiff received from the online estimator tool also closely tracked the amounts United answered in discovery were from its 2019 and 2021 fee schedules. Compare Defs. Ex. CC at UHC0002155–2156, Defs. Ex. HH at UHC0000993–996 (providing estimated amounts) with Pl. Ex. F (listing estimated allowed amounts under the MGPA's 2019 and 2021 fee schedules). Because United and its employees relied on a fee schedule to provide this information, United and its employees did not have discretion in determining the estimated amounts. See, e.g., Hawkes v. Wells Fargo & Co., No. 17-cv-00632-JSW, 2018 WL 11182068 (N.D. Cal. Jan. 30, 2018) (finding that defendant plan administrators did not act as fiduciaries when providing plaintiff estimates of her pension benefits via an online benefit calculator because "[d]efendants here simply provided [p]laintiff with an estimate of already accrued benefits pursuant to a set formula"); Stark v. Mars Inc., 518 F. App'x 477 (6th Cir. 2013) (finding benefits committee did not violate its fiduciary duty to the insured when it relied upon

45

an employee's ministerial work in management of software that calculates benefits because at the time of the insured's benefits calculation by the software, the committee had no reason to doubt the competence of the employee or the software).

Plaintiff has also failed to raise a genuine issue of material fact as to whether United acted as a fiduciary as to the act of providing estimates. Because United and its employees were reliant on fee schedules in providing estimates of services to plaintiff, there was no discretion involved. Thus, there is no genuine dispute of material fact remaining as to whether United acted as a fiduciary in providing estimates.

Because United did not act as a fiduciary when providing estimates or when checking the public credentials of network providers, the court **GRANTS** summary judgment on Count II to United. As the court grants summary judgment on this count, the court does not reach plaintiff's argument that a material issue of fact remains as to whether United committed a material misrepresentation, or United's argument that plaintiff's requested equitable relief is not available.

### c)    Count III

Count III of plaintiff's complaint brings a claim under 29 U.S.C. § 1132(a)(3) seeking equitable relief in the form of reprocessing of the claims by United. See Compl. ¶¶153–161. United moves for summary judgment on Count III, arguing that United did not violate any terms of the Plan or any ERISA provision, and, even if United did, ERISA does not entitle plaintiff to his requested relief. See United MSJ at 20–24. Plaintiff responds that Count III works in tandem with Count I, and because he has raised a material issue of fact as to whether United has violated a provision of ERISA or the Plan, he thus is entitled to his requested relief

as "reprocessing is appropriate for when benefits are available 'under the proper standard.'"
Pl. Opp. United at 16–19. United responds that "[p]laintiff has produced no evidence
supporting his belief about how the blood draw services should have been billed" and "has
not presented evidence that Sentara RMH Medical Center was not the provider of the blood
draw services." United Reply at 18–19. Thus, plaintiff has not established a violation of ERISA
or the plan by United. Id.

"[A] plaintiff may seek 'appropriate equitable relief' under ERISA § 1132(a)(3) if no
other ERISA provision provides a remedy." Bonner v. SYG Associates, Inc., 498 F. Supp. 3d
859, 872 (E.D. Va. 2020) (citing Griggs, 237 F.3d at 385 and Varity, 516 U.S. at 515). "The
relief authorized is not 'appropriate equitable relief at large,' … but rather, only such equitable
relief as will enforce the terms of the ERISA plan at issue or ERISA itself." Moon, 577 F.
App'x at 228 (citing Mertens v. Hewitt Assocs., 508 U.S. 248, 253, 113 S.Ct. 2063, 124 L.Ed.2d
161 (1993); U.S. Airways v. McCutchen, 569 U.S. 88, 133 S.Ct. 1537, 1548, 185 L.Ed.2d 654
(2013)). "[T]he Fourth Circuit has sensibly required a plaintiff seeking equitable relief to
establish two elements: (1) an act or practice that violates an ERISA or plan provision; and (2)
entitlement to a specific form of 'equitable relief' that has been deemed 'appropriate.'" Bonner,
498 F. Supp. 3d at 872 (citing Pender v. Bank of Am. Corp., 788 F.3d 354, 363 (4th Cir. 2015);
Moon, 577 F. App'x at 228). "Failure to establish one of the two elements is fatal to a claim
for equitable relief." Id. (citing Moon, 577 F. App'x at 232–33).

Plaintiff argues that his Count III is predicated on the denial of benefits claim alleged
in his Count I. See Compl. ¶¶153–161; Pl. Opp. United at 16–19. In its analysis as to Count I,
the court found that United had exercised reasonable discretion in making its benefits

determinations, and that plaintiff had not raised a genuine dispute of material fact as to issues raised in Count I. See § II.C.2(a), supra. Therefore, because plaintiff has not established United's liability under Count I, he is not entitled to relief under Count III. The court therefore **GRANTS** United's motion for summary judgment as to Count III.

### 3.    Sentara's Motion for Summary Judgment

Sentara moved for summary judgment on Counts II and III of the amended complaint, which are both brought under 29 U.S.C. § 1132(a)(3). Sentara argues it is entitled to summary judgment as to Counts II and III because ERISA does not apply, as Sentara is not a fiduciary. See Sentara MSJ; Sentara Reply. Plaintiff agrees Sentara is not a fiduciary. Pl. Opp. Sentara at 10 ("a claim under ERISA can be asserted against the Sentara [d]efendants even though they are not fiduciaries."). Plaintiff interprets the court's motion to dismiss opinion, however, to mean that "[t]his [c]ourt has already determined that this ERISA claim may be stated against the Sentara Defendants even though they are not a fiduciary under the plan." Pl. Opp. Sentara at 10. Sentara responds that § 502(a)(3) claims "necessarily require a fiduciary relationship," Sentara Reply at 3, as "ERISA is not designed to impose liability upon or protect the rights of providers," like Sentara. Sentara MSJ at 13. In Sentara's view, "[a]llowing Plaintiff's section 502(a)(3) claims to survive against the Sentara Defendants runs counter to the purpose of ERISA … and creates a de facto fiduciary relationship between patient and provider, which only the patient can impose." Id. at 14; see also Apr. 23, 2025 Hearing Tr., ECF No. 158, at 60:12–62:4 (discussing ramifications of extending liability under § 502(a)(3) to non-fiduciary healthcare providers). Sentara argues that because it is not afforded the benefits of exhaustion, notice, and deference under the Plan, if § 502(a)(3)'s liability was extended to it as a non-

fiduciary, "it would be in a worse position than any employer or insurer," Sentara MSJ at 13,

and would have no way to "limit exposure." Apr. 23, 2025 Hearing Tr., ECF No. 158, at

60:17–19.

In the court's motion to dismiss opinion, it commented:

> Despite the Sentara Defendants arguments to the contrary, their
> lack of fiduciary status does not insulate them from the reach of
> ERISA § 502(a)(3). See LeBlanc v. Cahill, 153 F.3d 134, 138 (4th
> Cir. 1998) (permitting claim against non-fiduciaries and non-
> parties in interest to proceed on a fraudulent misrepresentation
> claim); see also Harris Trust Tr. & Sav. Bank v. Salomon Smith
> Barney, Inc., 530 U.S. 238, 246–47 (2000) ("But § 502(a)(3)
> admits of no limit . . . on the universe of possible defendants.").

MTD Opinion at 17. The court's motion to dismiss opinion left open for discovery the

possibility that plaintiff could demonstrate that liability should attach to the Sentara defendants

as non-fiduciaries. Acknowledging that plaintiff did not move for summary judgment, and

thus bears only the burden of demonstrating a genuine dispute of material fact, see Matsushita,

475 U.S. at 586–87, the court proceeds by examining whether an ERISA claim can lie against

Sentara as a non-fiduciary.

"ERISA is a comprehensive statute designed to promote the interests of employees

and their beneficiaries in employee benefit plans." Shaw v. Delta Air Lines, Inc., 463 U.S. 85,

90, 103 S. Ct. 2890, 2896, 77 L. Ed. 2d 490 (1983). "ERISA protects employee pensions and

other benefits by providing insurance …, specifying certain plan characteristics in detail …,

and by setting forth certain general fiduciary duties applicable to the management of both

pension and nonpension benefit plans." Varity, 516 U.S. at 496, 116 S. Ct. at 1070. "As a

general rule, ERISA permits suits to recover benefits only against the plan as an entity, and

suits for breach of a fiduciary duty only against the fiduciary." Timmons v. Special Ins. Servs.,

Inc., 167 F.3d 537 (5th Cir. 1998); Terry v. Bayer Corp., 145 F.3d 28, 35 (1st Cir. 1998)

("ERISA contemplates actions against an employee benefit plan and the plan's fiduciaries.

With narrow exception, however, ERISA does not authorize actions against nonfiduciaries of

an ERISA plan." (quoting Santana v. Deluxe Corp., 920 F.Supp. 249, 253 (D.Mass. 1996))).

The primary exception to this general rule is that clarified by the Supreme Court in Harris Tr.

& Sav. Bank v. Salomon Smith Barney, Inc., 530 U.S. 238, 120 S. Ct. 2180, 147 L. Ed. 2d 187

(2000).

In Harris Trust, the Court held that non-fiduciaries who are "parties in interest" that

participate in prohibited transactions under ERISA § 406(a), 29 U.S.C. § 1106, may be held

liable under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3). See id. The Court stated, "§ 502(a)(3)

admits of no limit … on the universe of possible defendants. Indeed, § 502(a)(3) makes no

mention at all of which parties may be proper defendants—the focus, instead, is on redressing

the 'act or practice which violates any provision of [ERISA Title I].'" Id., 530 U.S. at 246, 120

S. Ct. at 2187 (quoting 29 U.S.C. § 1132(a)(3)). The specific prohibited transactions provision

at issue in Harris Trust provides that, "among other things, … '[a] fiduciary with respect to a

plan shall not cause the plan to engage in a transaction, if he knows or should know that such

transaction constitutes a direct or indirect ... sale or exchange ... of any property between the

plan and a party in interest.'" Id. at 242, 120 S. Ct. at 2185 (quoting 29 U.S.C. § 1106(a)(1)(A)).

"Congress defined 'party in interest' to encompass those entities that a fiduciary might be

inclined to favor at the expense of the plan's beneficiaries." Id.; see also 29 U.S.C. §

1002(14)(B) (defining "party in interest" as to an employee benefit plan to include "a person

providing services to such plan."). Thus, when the Supreme Court addressed § 502(a)(3)

liability in <u>Harris Trust</u>, the Supreme Court was considering a case where plaintiffs sought to enforce a provision of ERISA, rather than to enforce a provision of a plan as in the instant case. <u>See id.</u> at 243, 120 S.Ct. at 2185 ("[P]etitioners sued Salomon in 1992 under § 502(a)(3)… Petitioners claimed, among other things, that NISA, as plan fiduciary, had caused the plan to engage in a per se prohibited transaction under § 406(a) …, and that Salomon was liable on account of its participation in the transaction as a nonfiduciary party in interest. Specifically, petitioners pointed to § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A), which prohibits a 'sale or exchange ... of any property between the plan and a party in interest,' and § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), which prohibits a 'transfer to ... a party in interest ... of any assets of the plan.'"); <u>see also</u> 29 U.S.C. § 1132(a)(3) ("A civil action may be brought… by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any <u>provision of this subchapter</u> or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any <u>provisions of this subchapter</u> or the terms of the plan" (emphasis added)).

Courts have interpreted <u>Harris Trust</u> in different ways. For example, courts have extended <u>Harris Trust</u>'s reasoning outside of the prohibited transactions context to violations of other ERISA provisions. <u>See, e.g.</u> <u>Nat'l Sec. Sys., Inc. v. Iola</u>, 700 F.3d 65, 90 (3d Cir. 2012) ("Several Courts of Appeals have considered whether the Court's holding in <u>Harris Trust</u> applies only to alleged violations of § 406(a) or whether it sweeps more broadly. Without exception, they have concluded that the <u>Harris Trust</u> reasoning is not tethered to the

limitations of § 406(a)." (citing Second, Fifth, and Sixth Circuit cases[4])); Mass. Laborers'

Health & Welfare Fund v. Blue Cross Blue Shield of Mass., No. CV 21-10523-FDS, 2022 WL

952247, *16 (D. Mass. Mar. 30, 2022), aff'd, 66 F.4th 307 (1st Cir. 2023) ("[U]nder § 1132(a)(3),

actions against non-fiduciaries must be based on the non-fiduciary's participation in a breach

of fiduciary duty ... In other words, a claim under § 1132(a)(3) may be brought against a party

that is not a fiduciary, but such a party must have participated in a fiduciary breach (ostensibly

in concert with a fiduciary) for a claim under § 1132(a)(3) to stand."); Bonds on behalf of Flat

Rock Metal & Bar Processing Emp. Stock Ownership Plan v. Heeter, No. 23-12045, 2024 WL

2059721 (E.D. Mich. May 8, 2024) (declining to dismiss § 502(a)(3) claim on basis, in part, that

"under the reasoning of [Harris Trust], a plaintiff may seek equitable relief against a

nonfiduciary for knowing participation in a breach of fiduciary duty under § 404(a)(1) [29

U.S.C. § 1104(a)(1)]" as "[d]efendants have not persuasively articulated why, under § 502(a)(3)

and [Harris Trust], knowing participation in a § 404(a) violation should be treated differently

than knowing participation in a § 406(a) violation."). Other courts have recognized the

---

[4] The cases in the Second, Fifth and Sixth Circuits cited here extend Harris Trust in the context of attorneys holding assets for fiduciaries and similar financial transactions. See, e.g., Bombardier Aerospace Emp. Welfare Benefits Plan v. Ferrer, Poirot & Wansbrough, 354 F.3d 348, 353–54 (5th Cir. 2003), abrogated by ACS Recovery Servs., Inc. v. Griffin, 723 F.3d 518 (5th Cir. 2013) ("[E]ven though, in the instant litigation, the law firm is not a 'party in interest,' as that term is defined by ERISA, the Supreme Court's reasoning in Harris Trust influences us to conclude today that § 502(a)(3) authorizes a cause of action against a non-fiduciary, non-'party in interest' attorney-at-law when he holds disputed settlement funds on behalf of a plan-participant client who is a traditional ERISA party. As Harris Trust makes clear, an entity need not be acting under a duty imposed by one of ERISA's substantive provisions to be subject to liability under § 502(a)(3)."); Longaberger Co. v. Kolt, 586 F.3d 459, 468, 468 n.7 (6th Cir. 2009), abrogated by Montanile v. Bd. of Trs. of Nat. Elevator Indus. Health Benefit Plan, 577 U.S. 136, 136 S. Ct. 651, 193 L. Ed. 2d 556 (2016) (similar; finding that though defendant is not a party in interest, he is a proper defendant where he was an attorney retained by an ERISA plan beneficiary who received settlement funds from a third party); Carlson v. Principal Fin. Grp., 320 F.3d 301 (2d Cir. 2003) (remanding to district court for determination of whether under Harris Trust pension plan administrator's successor, who was not a fiduciary, could be a proper defendant if it had actual or constructive knowledge of the circumstances that rendered its transaction with the pension plan administrator unlawful).

limitations of Harris Trust. See McDannold v. Star Bank, N.A., 261 F.3d 478, 486 (6th Cir. 2001) (stating the limiting principles of Harris Trust to be: "First, … any recovery against a nonfiduciary under § 502(a)(3) is confined to 'appropriate equitable relief.'… Second, a nonfiduciary is liable only for its 'knowing participation' in a fiduciary's breach. … Third, at least on the facts of Harris Trust, liability was premised on the nonfiduciary's role as a party-in-interest to the prohibited transaction, though the Court's rationale would seem to apply to other nonfiduciaries as well.").

The Fourth Circuit has cited Harris Trust in the context of prohibited transactions. See, e.g., Walsh v. Vinoskey, 19 F.4th 672, 677–678 (4th Cir. 2021) (analyzing Harris Trust in context of party in interest transaction); Peters, 2 F.4th at 227–229 (discussing Harris Trust in context of party in interest transaction); LeBlanc v. Cahill, 3 F. App'x 98, 101–102, 2001 WL 119998, *2–3 (4th Cir. 2001) (discussing Harris Trust's evaluation of party in interest transaction); Moon, 577 F. App'x at 229 n.4 (stating the holding of Harris Trust to be, "holding that the authorization under 29 U.S.C. § 1132(a)(3) 'extends to a suit against a nonfiduciary 'party in interest' to a transaction barred by [29 U.S.C. § 1106(a)].'" (quoting Harris Trust, 530 U.S. at 241, 120 S.Ct. at 2184)). The Fourth Circuit's guidance on how liability attaches to non-fiduciaries is informative. For example, in Peters, the Fourth Circuit noted:

> Liability for ERISA violations can attach in certain circumstances even if a party is not a fiduciary. Under ERISA's prohibited transaction provision,
>
> > [a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect transfer to, or use by or for the benefit of a party in interest, of any assets of the plan.

> 29 U.S.C. § 1106(a)(1)(D). So, even though the plan fiduciary is
> the one who "cause[d] the plan to engage in a [prohibited]
> transaction," <u>id.</u> § 1106(a)(1), the "culpable fiduciary,"
> beneficiary, or trustee may still bring suit against "the arguably
> less culpable" party in interest because "the purpose of the action
> is to recover money or other property for the [plan
> beneficiaries]," <u>Harris Tr. & Sav. Bank v. Salomon Smith Barney,
> Inc.</u>, 530 U.S. 238, 252, 120 S.Ct. 2180, 147 L.Ed.2d 187 (2000)
> (citation omitted).

<u>Peters</u>, 2 F.4th at 228. In that case, the Fourth Circuit evaluated whether a subcontractor to a

claims administrator could be held liable under ERISA, despite the subcontractor not being

either a named or functional fiduciary as to the plan at issue. The allegation of wrongdoing in

<u>Peters</u> was that the claims administrator had worked with the subcontractor to add an

improper administrative fee to the subcontractor's bills such that the subcontractor's costs

were ultimately passed on to patients. <u>See id.</u> at 210–211. Though the subcontractor was

neither a named nor functional fiduciary, the Fourth Circuit found that an issue of material

fact remained as to whether the subcontractor could be held liable under a party in interest

theory as "a reasonable factfinder could infer that … [the subcontractor] could be held liable

as a party in interest involved in prohibited transactions based on its apparent participation in

and knowledge of [claims administrator's] administrative fee. <u>See id.</u> at 238–240. The Fourth

Circuit's analysis of the subcontractor's liability focused on the subcontractor's liability under

a party in interest theory, and noted that "[t]his concept of liability as a party in interest is

limited" such that the party in interest "must be demonstrated to have had actual or

constructive knowledge of the circumstances that rendered the transaction unlawful." <u>Id.</u> at

229 (quoting in part <u>Harris Tr.</u>, 530 U.S. at 251, 120 S.Ct. 2180).

Against this backdrop, and construing <u>Harris Trust</u> liberally, <u>see</u> <u>Dawson</u>, 931 F.3d at 278 (citing <u>Teamsters Joint Council No. 83 v. Centra, Inc.</u>, 947 F.2d 115, 123 (4th Cir. 1991) for the premise that "ERISA is a 'remedial statute' that 'should be liberally construed in favor of protecting the participants in employee benefit plans'"), the court interprets <u>Harris Trust</u> to extend liability to non-fiduciaries when non-fiduciaries engage in prohibited transactions as parties in interest or, when extrapolating, to extend liability to non-fiduciaries when non-fiduciaries knowingly participate in a breach of fiduciary duty by a fiduciary. Plaintiff here has not alleged that Sentara violated ERISA's prohibited transactions provision, nor alleged that Sentara has violated any other provision of ERISA. <u>See</u> Compl. ¶¶131-161; <u>see also</u> <u>Moon</u>, 577 F. App'x at 228 (emphasizing that in order to state a claim under § 1132(a)(3), plaintiffs must seek to "enforce the terms of the ERISA plan at issue or ERISA itself."). Rather, plaintiff seeks to enforce the terms of the Plan. <u>See</u> Compl. ¶¶131-161. The facts do not demonstrate participation by Sentara in a prohibited transaction.[5] The court has also found that United is not liable as a fiduciary on these facts. <u>See</u> § II.C.2, <u>supra</u>. Thus, Sentara cannot be liable for knowingly participating in a breach of fiduciary duty, because the court has not found such a breach occurred. Further, the court cannot discern any basis upon which to impose ERISA liability on Sentara, a non-fiduciary, when the court otherwise found no breach of fiduciary duty by United, an ERISA plan fiduciary. Therefore, the case before the court at summary

---

[5] There is no genuine dispute of material fact as to whether the allegations in Count II and III involve a prohibited transaction. For example, Count II focuses on United's alleged misprogramming of its website tool and mistraining of its agents, and United and Sentara's respective alleged failures to take "steps to correct the problem." Compl. ¶149. There is therefore no transaction involved in Count II, as transaction is understood under ERISA's prohibited transaction provision, 29 U.S.C. § 1106(a)(1). Likewise, Count III focuses on United's alleged failure to ensure Sentara was billing plaintiff according to negotiated rates plaintiff alleged should apply to the claims at issue. <u>See</u> Compl. ¶¶153–161. These allegations do not implicate a prohibited transaction under ERISA.

judgment does not fall under the exceptions allowing for non-fiduciary liability under Harris Trust. As the parties agree Sentara is not a fiduciary, the court cannot find Sentara liable under § 502(a)(3) on these facts.

Plaintiff argues that the court has already decided whether § 502(a)(3) liability can extend to Sentara as a nonfiduciary. See Pl. Opp. Sentara at 10. However, "[t]he law of the case doctrine does not prevent a court from granting summary judgment on a legal issue on which it previously denied a motion to dismiss." Coogan-Golden v. Wal-Mart Stores E., LP, No. 5:15-CV-00054, 2017 WL 2350120, at *5 (W.D. Va. May 30, 2017) (citing Am. Canoe Ass'n v. Murphy Farms, Inc., 326 F.3d 505, 514–515 (4th Cir. 2003)); see also Columbia Gas Transmission, LLC v. Ott, 984 F. Supp. 2d 508, 523 (E.D. Va. 2013) ("[D]enial of a motion to dismiss remains subject to reconsideration until the Court enters final judgment in the case. Therefore, such a denial does not constitute 'the law of the case' as envisioned by the Fourth Circuit and does not preclude the undersigned from recommending summary judgment …, even though a motion to dismiss on the same pleading was previously denied."). Therefore, though the court held at the motion to dismiss stage that plaintiff had stated a claim to relief that was plausible on its face as to plaintiff's § 502(a)(3) claims against Sentara, the court may reconsider its ruling at summary judgment. See, e.g., Columbia Gas, 984 F. Supp. 2d at 523; Am. Canoe Ass'n, 326 F.3d at 515 ("The ultimate responsibility of the federal courts, at all levels, is to reach the correct judgment under law."). In its motion to dismiss ruling, the court did not clearly articulate that the extension of ERISA liability to non-fiduciaries in Harris Trust turned on the defendant's involvement in a prohibited transaction as a party in interest or knowing participation in a breach of fiduciary duty by a fiduciary. Plaintiff has not

demonstrated, nor are facts present, that Sentara has participated in a breach of a fiduciary duty by a fiduciary or otherwise participated in a prohibited transaction. Though following the motion to dismiss stage it remained possible for plaintiff to demonstrate that liability could attach to Sentara under § 502(a)(3), facts have not been presented to the court at summary judgment demonstrating that would be appropriate here, nor do genuine issues of material fact remain on this issue.

In addition, the court is not persuaded by plaintiff's argument that the holdings of Estate of Spinner and Harris Trust cannot co-exist. See Pl. Opp. Sentara at 11. In Sentara's motion, it provides the standard for a § 502(a)(3) claim and cites to Moore v. Verizon Commc'ns, Inc., No. 1:22-CV-51 (RDA/IDD), 2022 WL 16963245 (E.D. Va. Nov. 15, 2022), aff'd, No. 22-2284, 2024 WL 399076 (4th Cir. Feb. 2, 2024) which in turn cites Est. of Spinner, 589 F. Supp. 2d at 747 for that standard. See Sentara MSJ at 6. Plaintiff argues that "Estate of Spinner… cannot overrule the specific opinion from the United States Supreme Court in Harris Trust and Sav. Bank," Pl. Opp. Sentara at 11, implying that Estate of Spinner's employment of the "defendant was a fiduciary" aspect of the test was improper in light of Harris Trust's teaching that there is no limit on who is a proper defendant under § 1132(a)(3).

In Estate of Spinner, a Western District of Virginia court held that "[t]o state a claim for a breach of fiduciary duty under § 502(a)(3), a plaintiff must show that: (1) the defendant was a fiduciary of the ERISA plan; (2) the defendant breached its fiduciary responsibilities under the plan; and (3) injunctive or other equitable relief is necessary to remedy the breach." Est. of Spinner, 589 F. Supp. 2d at 747 (citing Adams, 420 F.Supp.2d at 549). Estate of Spinner was not a case in the prohibited transactions context; rather, it dealt with a lapse in health

insurance coverage due to an insured's change in employment status and whether the circumstances of the lapse in coverage were actionable under ERISA against the insured's health insurer, former employer, and the alleged administrator of the health insurance plan. See id. at 740–742; id. at 744 (as to § 502(a)(2) claim, "[p]laintiff claims that [d]efendants breached fiduciary duties owed to it under ERISA by, among other things, refusing to provide information regarding [insured's] options for coverage, providing false and misleading information concerning the termination of [insured's] coverage, and failing to properly evaluate and consider options in a manner that took [insured's] best interests into account."); id. at 746 (noting the § 502(a)(3) claim was brought under the same facts as the § 502(a)(2) claim). Thus, the fact that Estate of Spinner opined that a § 502(a)(3) claim for breach of fiduciary duty inherently required that the plaintiff prove the defendant was a fiduciary is not in conflict with the Supreme Court's holding in Harris Trust that there is no limit as to the universe of defendants under § 502(a)(3).

The court also finds persuasive Sentara's argument that Sentara is not afforded the benefits of exhaustion, notice, and deference that the Plan provides. See Sentara MSJ at 12–14. Here, plaintiff is bringing claims under ERISA to assert his rights under the Plan. Though the Plan provides a multi-step appeals process for appealing Plan decisions, see, e.g., 2019 Plan at Pageid# 178–184, Sentara is not a party to the Plan, and thus is not entitled to the appeals process to which United and plaintiff have agreed. Thus, though this argument is not dispositive as to whether § 1132(a)(3) liability reaches Sentara, it is an additional factor weighing in favor of the court's ruling.

58

Further, the court is not persuaded by plaintiff's disagreement with defendants regarding whether Counts II and III are common law fraudulent misrepresentation claims or whether they are claims for breach of fiduciary duty. Plaintiff brought Counts II and III under § 1132(a)(3). See Compl. at 17, 20. Defendants argue that plaintiff's claims under § 1132(a)(3) are breach of fiduciary duty claims. Sentara MSJ at 6 n.2. Plaintiff disagrees, arguing that his claims are fraudulent misrepresentation claims. Pl. Opp. Sentara at 19. Plaintiff argues that the court "held that 'common law claims are actionable under ERISA § 502(a)(3)'" and thus "[d]efendants' assert[ion] that any claims based on misrepresentations are necessarily breach of fiduciary claims" is incorrect. Id. Plaintiff cites the court's motion to dismiss opinion in support of these statements. See id. In the court's motion to dismiss opinion, the court likened plaintiff's then-Count III, which is largely the same claim as the present Count III,[6] to a claim for fraudulent misrepresentation. MTD Opinion at 17 n.5. The court found that plaintiff's Virginia Consumer Protection Act claim against Sentara, which sought relief for alleged fraudulent misrepresentations, was expressly and completely preempted by ERISA. Id. at 21–24; see also Count V, First Amended Class Action Complaint, ECF No. 32 ¶¶176–182. The court found that plaintiff could seek relief for his complained-of-injury in the VCPA claim through his § 502 claim. MTD Opinion at 17 n.4, 21–24. The court commented of plaintiff's § 502 claim:

> Swartzendruber's claim against the Sentara defendants most closely resembles a claim for fraudulent misrepresentation. Several courts have held that common law claims are actionable under ERISA § 502(a)(3). See C Evans Consulting LLC v. Sortino Fin., LLC, No. CV GLR-21-2493, 2023 WL 5103725, at *5 (D.

---

[6] Compare Count III, First Amended Class Action Complaint, ECF No. 32 at ¶141-148, with Count III, Compl. ¶¶153-161.

Md. Aug. 8, 2023); <u>Jenkins v. Moses H. Cone Mem'l Health Servs. Corp.</u>, No. 5:16-CV-00188-FL, 2016 WL 9406697, at 4–7 (E.D.N.C. Dec. 30, 2016).

<u>Id.</u>

"Generally speaking, ERISA preempts state common law claims of fraudulent or negligent misrepresentation when the false representations concern the existence or extent of benefits under an employee benefit plan." <u>Griggs</u>, 237 F.3d at 378. Because of this general preemption of common law claims of fraudulent misrepresentation, §1132(a)(3) claims can be the proper mechanism through which to enforce the terms of a plan or ERISA arising out of "the same facts" as a common law fraudulent misrepresentation claim. <u>See id.</u> at 376–379 (in case where district court found fraudulent misrepresentation claim preempted by ERISA, but allowed plaintiff to amend to assert claim for breach of fiduciary duty under § 1132(a)(3), Fourth Circuit held district court properly found preemption and that defendant had breached its fiduciary duty); <u>see also</u> <u>Darcangelo v. Verizon Commc'ns, Inc.</u>, 292 F.3d 181, 195 (4th Cir. 2002) ("[W]hen a claim under state law is completely preempted and is removed to federal court because it falls within the scope of § 502, the federal court should not dismiss the claim as preempted, but should treat it as a federal claim under § 502. What was a state claim for breach of contract becomes a federal claim for the enforcement of contractual rights under § 502(a)(1)(B)."). When fraudulent misrepresentation claims are brought under § 1132(a)(3), they are commonly brought as breach of fiduciary duty claims. <u>See, e.g.</u>, <u>Est. of Spinner</u>, 589 F. Supp. 2d at 744–749 (asserting breach of fiduciary duties in violation of ERISA § 502(a)(3) where defendants allegedly "provid[ed] false and misleading information concerning the termination of [the insured's] coverage," among other alleged breaches of fiduciary duties).

60

This is so because "Congress intended ERISA's fiduciary responsibility provisions to codify the common law of trusts," and under those common law trust principles, "a fiduciary has an unyielding duty of loyalty to the beneficiary," with such duty of loyalty "preclud[ing] a fiduciary from making material misrepresentations to the beneficiary." Griggs, 237 F.3d at 380; see also Est. of Spinner, 589 F.Supp.2d at 748 ("ERISA fiduciaries have an obligation 'not to misinform employees through material misrepresentations and incomplete, inconsistent or contradictory disclosures.'" (quoting Griggs, 237 F.3d at 380)). Here, plaintiff's Counts II and III are not converted common law fraudulent misrepresentations claims, but rather are claims plaintiff originally brought under § 1132(a)(3). Because ERISA fiduciaries are precluded from making material misrepresentations, defendants are correct to state that Counts II and III are effectively claims for breach of fiduciary duty.

The court's cited cases in its motion to dismiss opinion do not hold otherwise. First, in C Evans Consulting, a District of Maryland court held that the plaintiff's claims for negligence, unjust enrichment, and declaratory judgment were preempted by ERISA because the plaintiff's claims were "not capable of resolution without an interpretation of the Plan, which is a contract governed by ERISA." C Evans Consulting LLC v. Sortino Fin., LLC, 686 F. Supp. 3d 389, 394-397, 2023 WL 5103725 (D. Md. 2023). Second, in Jenkins, an Eastern District of North Carolina court held in part that plaintiff's common law claims for breach of contract, tortious interference with contract, and declaratory judgment, were completely preempted by ERISA, but despite the preemption, there was no need to replead the claims in order for the claims to be treated as arising under ERISA. See Jenkins v. Moses H. Cone Mem'l Health Servs. Corp., No. 5:16-CV-00188-FL, 2016 WL 9406697, *5-6 (E.D.N.C. Dec. 30,

2016).[7] Thus, both C Evans Consulting and Jenkins are inapplicable to the situation before the court at summary judgment where plaintiff has brought claims directly under § 1132(a)(3), rather than common law claims that have been converted to federal ERISA claims.[8]

Returning to the issue at hand, plaintiff argues that "[b]ecause Congress chose not to limit the world of possible defendants under a § 1132(a)(3) [claim] to only fiduciaries, the Sentara [d]efendants are wrong to ask the [c]ourt to create such a limitation." Pl. Opp. Sentara at 11. The court does no such thing. Rather, the court finds that because Sentara is not a fiduciary, is not otherwise liable under Harris Trust, and the court found no breach of fiduciary duty by United, § 502(a)(3) liability does not extend to the Sentara defendants as non-fiduciaries on this record. It simply makes no sense to impose ERISA liability on Sentara, a non-fiduciary, when the court found no breach of fiduciary duty by United. The court therefore **GRANTS** summary judgment for Sentara on Counts II and III. As the court grants summary judgment for Sentara, the court need not reach Sentara's argument that no remedy exists under ERISA for plaintiff's claims related to the 2021 venipuncture and laboratory analysis. See Sentara MSJ at 20–21; Pl. Opp. Sentara at 20–22; Sentara Reply at 15–16.

In the alternative, the court notes that even if a fraudulent misrepresentation claim could lie against the Sentara defendants, plaintiff has not proven a fraudulent

---

[7] An additional word is appropriate on Jenkins. Jenkins dealt with allegations against a medical provider of charging amounts in excess of the plaintiff's payment obligations, similar to the case at bar. See Jenkins, 2016 WL 9406697 at *2. The plaintiff in Jenkins, however, had alleged that the defendant medical provider, and its agent, had a fiduciary relationship with the plaintiff, and plaintiff brought claims for common law breach of fiduciary duty and constructive fraud against the defendants. Id. at *7. The Jenkins court held that the common law breach of fiduciary duty and constructive fraud claims were expressly preempted by ERISA, and must be dismissed. Id. Because of the allegation of a fiduciary relationship in Jenkins, the case is inapposite to the issue before the court of whether or not an § 1132(a)(3) claim can be asserted against a non-fiduciary like Sentara.

[8] The court dismissed plaintiff's VCPA claim at the motion to dismiss stage. The court did not convert the VCPA claim into a federal ERISA claim.

misrepresentation occurred, or that Sentara otherwise violated ERISA. For example, plaintiff's allegations of misrepresentation in Count II against Sentara are that "[t]he Sentara Defendants informed Plaintiff that if he wanted to know how much medical services would cost him before obtaining the services from a Sentara entity, the most accurate answer would come from his insurance company," and after Sentara was put on notice "that United Healthcare had misprogrammed its website and mistrained its agents," Sentara took no steps to fix the problem. Compl. ¶¶131, 139, 142, 148–151. This does not amount to a fraudulent misrepresentation by Sentara as it is correct to state that the most accurate answer would come from plaintiff's insurance company. See DSOF ¶62; PODSOF at 11 (lodging no dispute to DSOF ¶62); see also 2021 Plan at Pageid# 312 (United "make[s] administrative decisions regarding whether the Policy will pay for any portion of the cost of a health care service you intend to receive or have received."); id. at Pageid# 359 ("What if you have a question? Call the telephone number shown your ID card."); 2019 Plan at Pageid# 131, 178 (same).

Plaintiff's allegations of misrepresentation in Count III against Sentara are that Sentara improperly billed its services for the two claims. See Compl. ¶¶153, 157–160. However, plaintiff has not demonstrated that Sentara improperly billed its services for the claims. First, the court agrees with the Kahan Report that the claims submitted by Sentara to United were properly submitted. See § II.B.2, supra. Second, though plaintiff asks the court to interpret the FPA and MGPA and find that, because defendants did not present evidence that the FPA was properly amended to add EMHC and SMHC to its Appendix I, services performed at EMHC and SMHC could not be billed under the FPA, the court need not conduct such an analysis because, whether or not plaintiff has standing to bring such an argument, which is a disputed

point, plaintiff has not demonstrated why his claims should have been billed under the MGPA. At their simplest, the FPA applies to services provided by certain facilities, and the MGPA applies to services provided by certain providers.[9] Assuming arguendo that plaintiff is correct that the FPA may not have been amended to specifically list EMHC and SMHC, the fact remains the EMHC and SMHC are off-campus departments of Sentara RMH Medical Center, as demonstrated by their inclusion under Sentara RMH Medical Center's CMS Certification Number and in Sentara RMH Medical Center's hospital accreditation. See Kahan Rep. ¶¶22–24. Because EMHC and SMHC are off-campus departments of Sentara RMH Medical Center, and the FPA was properly amended to include Rockingham Memorial Hospital, now-named Sentara RMH Medical Center, see Defs. Ex. DD; ECF No. 36-2 at 2, services rendered in-part at EMHC and SMHC and in-part at the main hospital location could be validly billed under the FPA. Also weighing in favor of this finding is the fact that at both EMHC and SMHC, the lessee was Sentara RMH Medical Center. See DSOF at ¶¶57–58; see also PODSOF at DSOF 57 (as to EMHC, disputing the importance of the lessee being Sentara RMH Medical Center, and arguing that Sentara RMH Medical Group also operated at EMHC). Therefore, plaintiff has not demonstrated a fraudulent misrepresentation as to either of his claims against Sentara. Plaintiff also has not demonstrated that Sentara otherwise violated a provision of ERISA.

---

[9] The FPA "applies to Facility's service locations set forth in Appendix 1" to the FPA. Pl. Ex. A at 4. The MGPA "applies to Medical Group's practice locations set forth in Appendix 1." Pl. Ex. C at §3.1. When comparing the MGPA's Appendix 1 to the FPA's Appendix 1, it becomes apparent that the MGPA applies to specific human providers, whereas the FPA applies to specific facilities where services are rendered. Compare Pl. Ex. C at 54–55 (MGPA list of human providers and their respective practice locations), with Pl. Ex. B at 11 (FPA list of institutional providers and their respective locations).

### III.    Conclusion

For the reasons stated herein, the motion for summary judgment filed by the United defendants, ECF No. 129, is **GRANTED**, the motion for summary judgment filed by the Sentara defendants, ECF No. 130, is **GRANTED**, and the motion for exclusion of defendants' expert filed by plaintiff, ECF No. 133, is **DENIED**. An appropriate order will be entered.

Entered: September 16, 2025

*Michael F. Urbanski*

Michael F. Urbanski
Senior United States District Judge